[Civ. No. 5814. Fourth Dist. June 23, 1958.]

KATHERINE C. BURTON, Respondent, v. HENRY J. BURTON, Appellant.

Swing, Scharnikow & Staniforth and Robert O. Staniforth for Appellant.

Clifford K. Fitzgerald for Respondent.

GRIFFIN, Acting P. J.—In an action for divorce instituted by plaintiff-respondent against defendant-appellant, the court found that the parties owned, as community property, a one-half interest in a certain named corporation, its stock, tools, equipment and good will. There was also a claimed community interest in certain rental units. The court found the total value of said business, good will, etc. to be $50,000. (Assets and accounts receivable were fixed at $45,112, and good will at $4,888.) It held that plaintiff was entitled to one-fourth of said valuation or the sum of $12,500, as her share of the community property. It found the rental units to be defendant's separate property. The main contention of defendant is that the findings of valuation of the community property interests in said business are contrary to the evidence. It was stipulated at the trial that the valuation was to be fixed as of the date of the separation, January 31, 1956, and that the community property be equally divided.

The evidence shows Burton Enterprises was incorporated for $75,000 in 1956. It was owned and operated by defendant and his brother, who held the corporate stock. Each had a drawing account of $10,000 per year and shared equally in its profits. The business is the outgrowth of a family partnership and has, over the years, been quite successful from a financial standpoint. The gross sales for 1955 was $190,179.49, with a net profit of $28,195, after paying the drawing accounts. The gross sales for 1956 between January and September was $235,616.19, with an estimate of $300,000 for that year. It was claimed by defendant that the business had no good will value as a going concern. It would appear that this testimony refutes that claim. The value of 13 items of rolling stock consisting of cars and trucks, was carried on the corporate books. Depreciation was allowed on a three-year basis. In all probability it did not reflect their actual value. Some

cars and trucks were still in use after the three-year depreciation period although carried on the books as of "no value." Some were not completely paid for by the company. Many of the trucks were improved with equipment for this line of business and had two-way radio equipment. To accommodate this service a transmitter station was erected costing about $5,000. The court disregarded the Blue Book value and placed a higher valuation thereon.

Defendant and his witnesses testified the real property valuation was not more than $20,000, plus $6,000 cost of model home built upon it. Pictures of the building were received in evidence. There is evidence that the plaintiff employed investigators who called at defendant's office with a public accountant to go over defendant's books and they were ordered off the property. Later, by agreement, the accountant went there again and did see the books and looked over the property in general and took photographs of it. It consisted of a new office building, a two-bedroom home, three warehouses, stock consisting of electrical fittings and equipment and stock. Defendant said he would not give the auditor an inventory of the property other than that reflected on the books. The investigator testified that he said he was going to the various creditors and determine the status of their account with the defendant's company, but was told by defendant's brother, in defendant's presence, that if he did he would "get a bad case of lead poisoning." Defendant testified he had made a current inventory of stock and equipment but had not carried out the values, as yet; but he said his estimate of its value was about $5,000; and that he believed the company owed about $69,000 in outstanding obligations.

Plaintiff produced a certified public accountant who testified he examined the books of the company and they were kept on a "going concern" basis; that his investigation definitely showed the market value would be substantially higher than the actual book value; that the model home, constructed on the property at an approximate cost of $6,500, was not carried on the books as a capital asset but was charged off as expenses; that according to book value there was a capital equity of $20,000 between the brothers. A verified statement as to what the books reflected was received in evidence. He testified that as of January 31, 1956, the total capital assets as reflected by the books were $30,662.20, i.e., a valuation account arrived at by subtracting the accounts payable from the unrealized accounts receivable; and that there was a plastic cabin cruiser

valued at $2,600, which was listed as a business deduction. The difference between accounts payable and accounts receivable showed a figure of $23,430.99 in the black.

There was testimony, in detail, by an appraiser, that the Blue Book value of many of the articles of machinery and rolling stock was in excess of the values carried on the company's books. Plaintiff testified defendant told her at the time the business was incorporated in 1956 that defendant and his brother were going to incorporate for $75,000 but that the business was actually worth between $80,000 and $100,000, and they had the books set up so that should plaintiff ever leave him, he had it fixed so she would never be able to obtain anything out of it; that thereafter, when he was drinking, he bragged about being worth anywhere between $80,000 and $150,000.

After the reception of the corporation's books in evidence defendant's bookkeeper testified from summaries taken therefrom and said that the books, as of December 31, 1955, after subtracting the accounts payable from the accounts receivable, showed current assets of $38,861.32; that under this system (cash basis) of keeping books, they did not carry a bad debt account; and that usually on such accounts, two per cent is allowable for bad debts. She explained several items reflected in the books as to valuations and how they were obtained, and said the total assets fixed and current, were $66,876.31 at the end of the year 1955, and against that were accounts payable totaling $35,475.74, showing a net worth of $31,400.57. A similar showing was made for 1956, and income tax returns were prepared accordingly.

Defendant produced other evidence as to the value of the rolling stock and equipment. Counsel for defendant, in reply to an inquiry by the court, said that in making application to the Corporation Commissioner for the approval of the corporation, a statement justifying the value of $75,000 stock capitalization was submitted.

From a summarization of the transcript of the evidence, the trial judge remarked that he was impressed by a former statement of the parties, made to the Corporation Commissioner, that the assets of their business amounted to at least $75,000, in order to secure a capitalization in that amount, but in addition, he relied upon the other evidence produced that the value of the property and business was $71,112, less $26,000 obligations owing; that he did not consider the actual

value of the rolling stock to be nothing, after three years depreciation; that he took into consideration the value of the yacht, trailer house, telephone communication system owned by the corporation, as well as the inventory furnished; ·that the balance of accounts receivable and accounts payable were likewise considered; that the good will did have a value and he fixed it at $4,888, all totaling $50,000; and that accordingly plaintiff was entitled to $12,500 on that basis.

The main complaint is that the court was unauthorized to lay so much weight on the figure of $75,000 as a basis for the value of the assets of the corporation, including good will, as indicated by the authorized capitalization; that the record of the value, as evidenced by the books, was unimpeached and must prevail; that $31,506.13 is that value; and that plaintiff was entitled to no more than a one-fourth interest therein. It is also argued that since there was no good will and its value, if any, was not established, it was error to allow the sum indicated for that purpose.

While it might well appear that the trial court did adopt the figure of $75,000 as the actual value of the properties, including the good will, it is clearly indicated he also considered the other evidence admitted in arriving at that determination, and deducted certain items allowable. ▇ Good will has been held to be property of an intangible nature and is recognized as a thing of value. (*Levinson Estate*, 2 Cof. 325; 24 Cal. Jur.2d p. 141, § 3.) ▇ It has been held that opinion evidence, as to its value, is admissible but not conclusive; that it is difficult to approximate the value of good will; that the situation of the premises, the amount of patronage and the general conditions existing at the time are stronger evidence than the opinion of a so-called interested expert; that the data for estimating the value of the good will of a business are always more or less uncertain and depend very much upon the personality of the parties engaged in the business; that one man by his personality, his adroitness in conducting his business, his geniality in attracting customers, and his wide acquaintance with his customers, may be capable of doing a profitable business where another, lacking some or all of these qualities may fail, or at least not succeed to the extent his predecessor had attained; that the fact that the business had been long established, and the habit of customers who have been used to dealing at a particular place to continue to go there, and the fact that there may be some other attraction, such as the location, etc., are elements not to be overlooked;

and that after all, it is a question for the jury, taking all the circumstances, including the testimony of persons familiar therewith, into consideration. (*Sturtevant* v. *Dowson*, 110 Ore. 155 [222 P. 294].) To the same effect is 38 Corpus Juris Secundum 953, 954, section 6, reciting:

"The determination of the question must, within proper limits, be left to the jury, whose conclusion must rest on evidence legitimately tending to establish value and supporting the verdict.

"In determining the value the profits are necessarily taken into account, and the value is usually estimated at so many years' purchase on the amount of such profits. . . .

"A principle applied in some cases is that the valuation of good will may be fairly arrived at by multiplying the average net profits for a period of years by the number of years, such number being suitable and proper, having reference to the nature and character of the particular business under consideration . . .

"*Evidence.* The basis of the estimate is past profits. Evidence of the condition of the business subsequent to the sale thereof has been admitted, however, for the purpose of enabling the jury to make comparisons and draw conclusions as to the condition at the time of the sale. Expressions as to the value of the good will of a business must usually be regarded as the statement of an opinion and not as a statement of fact." (See also *Mueller* v. *Mueller*, 144 Cal.App.2d 245 [301 P.2d 90], where this rule is cited.)

 Here, the trial court had before it the fact that these two brothers had been, for many years, successfully operating this concern as a partnership. It was well known in the community; it had many employees and accumulated considerable up-to-date equipment; and the assets and property of the partnership were set forth in a statement to the Corporation Commissioner in establishing the capital stock of $75,000. Stock was conditionally issued to the partners in that sum. Corporations Code, section 3018, provides a penalty for filing a false statement. The term "Capital Stock" is frequently used to express the property and assets of a corporation. Strictly speaking, the capital stock of a corporation is the money contributed by the corporators to the capital, and is usually represented by shares issued to subscribers to the stock on the initiation of the corporate enterprise. It consists of the consideration received or agreed to be received in

exchange for all issued stock, whether the consideration takes the form of money paid, labor done, or property actually received. (12 Cal.Jur.2d p. 666, § 89. See also *Excelsior Water & Mining Co.* v. *Pierce*, 90 Cal. 131, 140 [27 P. 44].) ·

If the book value submitted to secure the stock was less than the $75,000 indicated, the court might well have concluded that the good will of the corporation made up a part of the difference in arriving at the value for which the corporation was capitalized. Although not conclusive, this was some evidence of the value of the assets and good will. When considered together with the other evidence produced, and particularly the claimed statement of defendant that the company was actually worth between $80,000 and $100,000 when it was incorporated, and the books showed an increasing business and return of gross profits in the amount indicated, we must conclude the trial court was justified in fixing the value of the good will and determining the value of plaintiff's one-fourth interest therein at the figures indicated. (*Levene* v. *City of Salem,* 191 Ore. 182 [229 P.2d 255, 263] ; 38 C.J.S. p. 953, § 6; 12 Cal.Jur.2d p. 666, § 89; 24 Cal.Jur.2d p. 140, § 2.)

While good business practice might well have allowed a deduction of two per cent in bad debt losses, there is no evidence of such losses, and the court was justified in disallowing such percentage in its calculations. No error appears from the record in reference to the distribution of other personal property.

Judgment affirmed.

Mussell, J., and McCabe, J. pro tem.,\* concurred.

A petition for a rehearing was denied July 15, 1958.

---

\*Assigned by Chairman of Judicial Council.