[S.F. No. 24541. June 28, 1984.]

THE PEOPLE ex rel. DEPARTMENT OF TRANSPORTATION,
Plaintiff and Appellant, v.
GEORGE H. MULLER et al., Defendants and Respondents.

**COUNSEL**

Richard G. Rypinski, Lee Tyler, Robert J. DeFea, Noval Fairman, Kenneth G. Nellis, Thomas C. Nagle and David W. Robison for Plaintiff and Appellant.

Gary R. Rinehart for Defendants and Respondents.

## OPINION

**BIRD, C. J.**—This case presents the first occasion for this court to construe the provision of the 1975 Eminent Domain Law which authorizes compensation for the loss of business goodwill caused by a forced relocation. (Code Civ. Proc., § 1263.510.)[1] The specific issue to be addressed is whether a condemnee may be compensated for loss of goodwill when he demonstrates that, as a result of a forced move, his business has lost profitability and has a reduced market value.

### I.

The business which is the subject of these proceedings is a veterinary practice in Walnut Creek. Dr. George H. Muller, who has been practicing in Contra Costa County since 1947, opened the practice in 1955. The Department of Transportation (Department) condemned the parcel of land (the North Main Street parcel) on which his veterinary hospital has been located since 1956.

Dr. Muller incorporated his practice in 1971. A few years later, he sold some shares in his practice to his colleagues, Drs. Kennedy and Bjork, but Dr. Muller retained a majority interest. The corporation signed a 15-year agreement to lease the North Main Street parcel and veterinary hospital from Dr. Muller and his wife.

Sometime in 1972, the Department notified Dr. Muller that it was considering condemnation of the North Main Street parcel to make way for additional construction on Interstate 680.

In 1974, the three shareholders (Drs. Muller, Kennedy, and Bjork) entered into a restrictive stock agreement which provided that shares could

---

[1]Section 1263.510 provides as follows:

"(a) The owner of a business conducted on the property taken, or on the remainder if such property is part of a larger parcel, shall be compensated for loss of goodwill if the owner proves all of the following:

"(1) The loss is caused by the taking of the property or the injury to the remainder.

"(2) The loss cannot reasonably be prevented by a relocation of the business or by taking steps and adopting procedures that a reasonably prudent person would take and adopt in preserving the goodwill.

"(3) Compensation for the loss will not be included in payments under section 7262 of the Government Code.

"(4) Compensation for the loss will not be duplicated in the compensation otherwise awarded to the owner.

"(b) Within the meaning of this article, 'goodwill' consists of the benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage."

Unless otherwise indicated, all statutory references are to the Code of Civil Procedure.

not be sold without giving the other shareholders a right of first refusal. Also in 1974, it was agreed that if the North Main Street parcel were to be condemned, Dr. Muller and his wife would buy or build a replacement hospital and would lease it to the corporation. The rental of the new facility would be 10 percent of Dr. Muller's costs for land and construction.

In 1977, Dr. Muller announced that he was ready for partial retirement and wished to work only in his specialty, veterinary dermatology. He began negotiating with Drs. Kennedy and Bjork to sell them his share of the practice. In the summer of 1978, Drs. Kennedy and Bjork retained Don Dooley, a veterinary practice management consultant, to estimate the goodwill value of the practice. Utilizing the "capitalization of excess earnings" accounting method, Dooley estimated the goodwill value of the practice at $225,000.[2]

Also in 1978—while the shareholders were still negotiating—the Department confirmed that it had decided to proceed with condemnation of the North Main Street parcel. Pursuant to the 1974 agreement among the shareholders, Dr. Muller began looking for a suitable building in which to relocate. Since he was unable to find such a building in the area of his practice, he purchased a parcel of land on Treat Boulevard, approximately nine-tenths of a mile from the North Main Street parcel. Construction of a new hospital commenced shortly thereafter.

During the remainder of 1978 and 1979, Dr. Muller continued to negotiate with his fellow shareholders and several veterinarian employees about the sale of his interest in the practice. At that time, it was anticipated that the total cost of the new Treat Boulevard facility, including land and improvements, would be approximately $400,000. It was obvious that the practice's rental costs would increase greatly under the 1974 agreement.[3] As a result, Dr. Muller was forced to reduce the asking price for his interest

---

[2]The capitalization of excess earnings approach values goodwill as follows. First, the net earnings of the business are computed by subtracting expenses and reasonable officers' salaries from gross earnings. Next, a percentage return which would "normally" be expected from the value of the tangible assets of the business is calculated and then subtracted from the net earnings. The remaining figure, if any, is the "excess' earnings of the business and is attributable to intangible assets, usually goodwill. The capitalized present value of the excess earnings is computed by dividing the excess earnings figure by a percentage which reflects current interest rates. (See Maleck, *Loss of Business Goodwill in Eminent Domain Proceedings* (1978) 53 State Bar J. 32, 33; Note, *An Inquiry Into the Nature of Goodwill* (1953) 53 Colum.L.Rev. 660, 677-679, 700-707; Aloi & Goldberg, *A Reexamination of Value, Good Will, and Business Loss in Eminent Domain* (1968) 53 Cornell L.Rev. 604, 629-630.)

[3]As previously noted, the 1974 agreement provided that the annual rent at the new building would be 10 percent of the land and construction costs The annual rent at the old building immediately prior to the move was slightly under $25,000.

in the practice. Even at a greatly reduced price, the negotiations fell through. Fearing that their income would be insufficient to cover the increased costs at the new location, the other veterinarians who had contemplated buying Dr. Muller's interest left the practice.

Dr. Muller was unable to sell the goodwill of his practice in the face of the impending rent increase. Further, he was unable to close his practice, since its goodwill value was a substantial part of his retirement fund. Therefore, he proceeded with the construction of the new building on Treat Boulevard. It was eventually constructed at a total cost for land and improvements of $502,000. The practice was moved to that location in May 1980. Pursuant to the 1974 agreement, Dr. Muller leased the Treat Boulevard building to the practice at an annual rent of $54,000.

The Department's condemnation action against the North Main parcel went to trial on the issue of compensation in 1981.[4] Three experts testified concerning the value of the business goodwill which was lost as a result of the condemnation.

Two of the experts, Dan Dooley and Jeffrey Martin, testified on Dr. Muller's behalf. Dooley, the consultant who had appraised the practice in 1978, testified that he had reappraised its goodwill as of August 1979. Using the same excess earnings method described above (but with updated income figures and a capitalization rate of 15 percent rather than 12 percent), he concluded that the value of the practice at the old location was $250,000—$50,000 in tangible assets, and $200,000 in goodwill. Using the same method, he concluded that the value of the practice at the new location was limited to the value of the tangible assets. The substantial rent increase had dissipated the excess earnings.

Dr. Muller's other expert witness, accountant Martin, also used the excess earnings method. He used slightly different expense figures to arrive at his conclusion as to the amount of excess earnings. Applying the same 15 percent capitalization rate, he calculated the goodwill value of the practice before condemnation at approximately $176,000. For his "after" calculations, he added in the extra expenses for rent and property taxes at the new location. Since these extra expenses were greater than the excess income before condemnation, Martin also concluded that the goodwill value of the practice had entirely disappeared.

---

[4]Section 1260.210 et seq. sets forth the procedures for a trial on this issue when settlement between the parties has not been reached.

The Department's expert, Ronald Hansen, testified that the practice had no goodwill value either before or after the move. Unlike Martin and Dooley, Hansen had deducted from the gross earnings a figure representing the *actual* salaries paid to the veterinarians. (Martin and Dooley had deducted only what they believed to be the *reasonable* salaries which would normally have been paid to veterinarians who were employees rather than shareholders in the practice.) Hansen concluded that there had been no excess income before condemnation because what Martin and Dooley had called the practice's excess income had actually been paid out to its shareholders and employees in the form of salaries.

Dr. Muller testified concerning the reasonableness of his expenses at the new location—the expenses which, according to his experts, had swallowed the practice's goodwill. He testified that typically a veterinary practice is limited geographically to a radius of five or six miles. People will generally not travel any farther, he believed, to take their pets to a veterinarian. In order to keep his clientele, Dr. Muller believed that he would have to relocate within a few miles of his old office. This, of course, limited his choice of new sites to downtown Walnut Creek.

The move was apparently successful in maintaining the patronage of the practice. During the months between the relocation and the trial, there was no loss of either customers or gross income.

The jury awarded Dr. Muller $96,000 for the value of the goodwill taken by the condemnation.[5] The Department appealed, contending that the evidence showed only a loss of profits, not of goodwill.

## II.

This court must decide whether Dr. Muller's loss of excess income comes within the statutory definition of compensable "goodwill."

Section 1263.510 defines "goodwill' as "the benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage." Dr. Muller has clearly lost a "benefit" which accrued to the practice as a result of its former "location." He has lost the cheap rent in an older building which enabled his practice to show a profit.

---

[5]It also awarded him $299,000 for the value of the land and building at the old location.

The Department argues that section 1263.510 authorizes compensation only for losses attributable to a loss of patronage. It argues that the statute does not authorize compensation of any or all lost "benefits" attributable to a change of location. Rather, the statute lists "location" as one of the factors which may affect patronage. The Department argues that there is a compensable loss of goodwill only when there is a loss of patronage. For several reasons the Department's argument is in error.

First, section 1263.510 does not so limit "goodwill." The statute recognizes that "location" is one of the "circumstances" which results in "retention of old or acquisition of new patronage." The statute does not authorize compensation for a loss of patronage as such. It does authorize compensation for a loss of "benefits" of "location." There are other benefits to a particular location besides patronage. While location unquestionably affects patronage—indeed, Dr. Muller chose his new location precisely because it would allow him to retain his old patronage—a given location may well carry additional benefits. Here, the old location carried the manifest benefit of a cheap rent in an older building. The statute authorizes a court to award compensation for the loss of this benefit.

Second, to the extent the statute is ambiguous, the applicable rules of statutory construction require this court to adopt Dr. Muller's more liberal interpretation. ■ A statute which "is remedial in nature and in the public interest is to be liberally construed to the end of fostering its objectives . . . . 'The rule of law in the construction of remedial statutes requires great liberality, and wherever the meaning is doubtful, it must be so construed as to extend the remedy.' [Citation.]" (*Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 434-435 [296 P.2d 801, 57 A.L.R.2d 914]; see also *Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 153 [23 Cal.Rptr. 592, 373 P.2d 640].) ■ Moreover, the contrary rule requiring strict construction of statutes which impose new liability (see, e.g., *Hutchins* v. *Waters* (1975) 51 Cal.App.3d 69, 72-73 [123 Cal.Rptr. 819]) does not apply where strict construction would thwart " 'the palpable intent of the Legislature to impose a new liability consonant with new conditions.' [Citation.]" (*Peterson* v. *Grieger, Inc.* (1961) 57 Cal.2d 43, 50-51 [17 Cal.Rptr. 828, 367 P.2d 420]; *Continental Cas. Co.* v. *Phoenix Constr. Co., supra,* 46 Cal.2d at p. 434.)

In addition, the California Law Revision Commission comment to section 1235.010 states that "[u]nless otherwise provided in this title, the preliminary provisions of the Code of Civil Procedure are applicable." Section 4 provides that "[t]he rule of the common law, that statutes in derogation thereof are to be strictly construed, *has no application to this Code.* The

Code establishes the law of this State respecting the subjects to which it relates [including eminent domain], and its provisions and all proceedings under it *are to be liberally construed,* with a view to effect its objects and to promote justice.''[6] (Italics added.)

■ The remedial purpose of the statute under consideration is evident. Section 1263.510 was enacted in 1975 as part of a comprehensive revision of eminent domain law in California. (See 13 Cal. Law Revision Com. Rep. (1975) pp. 1007, 1038, 1218-1219; Maleck, *Loss of Business Goodwill in Eminent Domain Proceedings, supra,* 53 State Bar J. 32.) The section was enacted in response to widespread criticism of the injustice wrought by the Legislature's historic refusal to compensate condemnees whose ongoing businesses were diminished in value by a forced relocation. (See *Community Redevelopment Agency* v. *Abrams* (1975) 15 Cal.3d 813, 831 [126 Cal.Rptr. 473, 543 P.2d 905, 81 A.L.R.3d 174]; see generally Kanner, *When is "Property" Not "Property Itself": A Critical Examination of the Bases of Denial of Compensation for Loss of Goodwill in Eminent Domain* (1969) 6 Cal. Western L.Rev. 57; Note, *The Unsoundness of California's Noncompensability Rule as Applied to Business Losses in Condemnation Cases* (1969) 20 Hastings L.J. 675; Bingham, *"Fair Market Value," "Just Compensation," and the Constitution: A Critical View* (1970) 24 Vand. L.Rev. 63; *An Act to Provide Compensation for Loss of Goodwill Resulting from Eminent Domain Proceedings* (1966) 3 Harv. J. on Legis. 445, 451; Comment, *Eminent Domain Valuations in an Age of Redevelopment: Incidental Losses* (1957) 67 Yale L.J. 61.) The purpose of the statute was unquestionably to provide monetary compensation for the kind of losses which typically occur when an ongoing small business is forced to move and give up the benefits of its former location.

The new eminent domain law was enacted during a period of rapidly rising real estate values. The Legislature must certainly have been aware that a business which is forced to move will usually have to pay more for the purchase or rental of new quarters—particularly if it has been at the old location for a long time. An older building and a lower rent are among the most obvious "benefits . . . of . . . location" which a small business stands to lose when it is condemned. Economic conditions at the time the statute was enacted support the view that the Legislature intended to compensate losses such as Dr. Muller's which are attributable to increased rental expenses resulting from a forced move.

---

[6]No other provision in the preliminary definitions and rules of construction of the eminent domain law (§§ 1235.010-1235.210) contravenes the "liberal construction" mandate of section 4.

Furthermore, to characterize the profitability which Dr. Muller lost as goodwill is consistent with the definition of goodwill used in other contexts. Courts have long accepted that goodwill may be measured by the capitalized value of the net income or profits of a business or by some similar method of calculating the present value of anticipated profits.[7] (E.g., *Burton* v. *Burton* (1958) 161 Cal.App.2d 572, 576-577 [326 P.2d 855]; *Mueller* v. *Mueller* (1956) 144 Cal.App.2d 245, 252 [301 P.2d 90] [valuation of goodwill of a business owned as community property upon dissolution of the marriage].) Dr. Muller presented evidence of the capitalized value of his profits. This showing would have been accepted as the measure of goodwill in *Burton* or in *Mueller*. Evidence that this value had been lost as a result of the move was also adduced. Plainly, the statute was meant to compensate him for this loss.

A third reason to reject the Department's definition is the absurd and unjust results that would obtain. Had a suitable location not been available in Walnut Creek, Dr. Muller might well have had to move his practice farther from Walnut Creek. The result might have been the loss of some patrons. This would have been counterbalanced by a lower rent than is now paid in Walnut Creek. If this hypothetical move had caused the same reduction in profits as Dr. Muller suffered from his actual move, he would have been entitled to at least partial compensation under the Department's definition of goodwill.[8] Yet it would be arbitrary to compensate him for the first loss but not the second.

Under the Department's definition of goodwill, Dr. Muller would also be entitled to compensation for expenses reasonably incurred in an effort to prevent a loss of patronage. (*Albers* v. *County of Los Angeles* (1965) 62

---

[7]Goodwill must, of course, be measured by a method which excludes the value of tangible assets or the normal return on those assets. (See Note, *Valuation of Professional Goodwill upon Marital Dissolution* (1975) 7 Sw.U.L.Rev. 186.) However, the courts have wisely maintained that there is no single acceptable method of valuing goodwill. (*In re Marriage of Foster* (1974) 42 Cal.App.3d 577, 583 [117 Cal.Rptr. 49].) Valuation methods will differ with the nature of the business or practice and with the purpose for which the evaluation is conducted. (*In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 108-111 [113 Cal.Rptr. 58].) Nothing in this opinion is intended to restrict litigants in eminent domain actions from using other valuation methods than the one employed here.

[8]The evidence showed that Dr. Muller's old rent was approximately $25,000 per year. His new rent was $54,000 per year. Thus, the practice lost approximately $29,000 per year in profits, but no patronage. Under the Department's definition of goodwill, none of the lost $29,000 was compensable.

Assume, however, that the practice had moved farther from Walnut Creek with a new rent of $40,000. Assume further that the practice lost $14,000 per year in net receipts due to lost patronage. The practice would still show a loss of $29,000 per year—$14,000 in lost receipts and $15,000 due to a higher rent. The Department would compensate Dr. Muller for $14,000 of his loss under these hypothetical facts.

Cal.2d 250, 269-272 [42 Cal.Rptr. 89, 398 P.2d 129].) It appears that his expenses—the higher rent at the new location—were incurred in a reasonable (and apparently successful) effort to prevent a loss of patronage. The Department conceded as much in its trial brief and on this appeal. Thus, had the case been tried on a theory that the higher rent was reasonably necessary to mitigate a threatened loss of patronage, Dr. Muller might well have been awarded the same recovery.

### III.

Clearly, Dr. Muller's loss comes within the statutory definition of compensable goodwill. ▇▇ The "excess income" method used by the expert witnesses is a reasonable method of quantifying the loss even though there are other acceptable methods for evaluating goodwill.

Accordingly, the judgment is affirmed.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

Appellant's petition for a rehearing was denied September 13, 1984.