[No. A118222. First Dist., Div. Five. Dec. 5, 2008.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Respondent, v. MARTIN J. COYNE et al., Defendants and Appellants.

COUNSEL

Coblentz, Patch, Duffy & Bass, Jonathan R. Bass and Howard A. Slavitt for Defendants and Appellants.

Dennis J. Herrera, City Attorney, Kristen A. Jensen, Thomas S. Lakritz and Christine Van Aken, Deputy City Attorneys, for Plaintiff and Respondent.

OPINION

**SIMONS, J.**—Appellants Martin J. Coyne (Coyne) and Brian Murphy O'Flynn (O'Flynn) are former owners of a parcel of undeveloped property located on Lombard Street in San Francisco that was acquired by respondent City and County of San Francisco (CCSF) in an eminent domain proceeding.

The taking frustrated appellants' plan to develop a multiunit residential and commercial complex on that site, and in the eminent domain proceeding they sought damages for lost business goodwill. The trial court, however, barred that claim. A jury ultimately rendered a judgment awarding appellants just compensation for the real property taken by CCSF. Appellants contend the court erred by precluding them from presenting to the jury evidence of the loss of goodwill. We disagree and affirm. The trial court correctly determined appellants had no ongoing business located on the undeveloped parcel taken, a necessary predicate for recovery of lost goodwill.

## BACKGROUND

O'Flynn and his business partner, Coyne, each owned a 50 percent interest in a parcel of undeveloped property located at 701 Lombard Street (the Property). O'Flynn has been a real estate developer and builder for approximately 10 years.

In 2002, appellants began leasing the Property to Tower Valet Parking Incorporated (Tower Valet) for use as a parking lot. The month-to-month lease allowed Tower Valet use of the lot seven days per week and 24 hours per day, and was terminable upon 30 days' notice. O'Flynn testified that interim use of a development site in this manner is typical in the development business. No physical structures or improvements were located on the Property after appellants purchased it, other than the parking lot pavement itself and a small kiosk for the parking attendant.

In connection with the proposed development project, appellants formed an entity called "701 Lombard LLC." Appellants registered that entity with the State of California and listed the business address as 736 Clementina Street, not 701 Lombard Street. Appellants did not maintain an office or store any real estate development records or files on the Property. Appellants did not receive mail delivery at the Property, and there were no phone or fax lines installed there. O'Flynn periodically parked his truck on the Property to review documents, conduct business on his cell phone, and meet with surveyors, architects, and neighbors.

In June 2003, the CCSF Planning Commission approved appellants' application to build a nine-unit residential condominium with ground floor retail space on the Property. On February 19, 2004, the CCSF Board of Supervisors passed a "Resolution of Necessity," which stated that public interest and necessity required the acquisition of the Property by eminent domain so that it could be developed and maintained as open space.

Before CCSF passed its Resolution of Necessity, appellants had commissioned and received architectural and engineering plans for the proposed development of the Property, and had secured approval for the proposed project from the CCSF Planning Commission. They had not obtained a building permit to construct the condominium project, begun construction, or secured construction financing. Appellants also had not presold or preleased any of the residential or commercial units. Appellants had invested approximately $150,000 in the project, not including the purchase price of the land, mortgage costs, property costs, or compensation for their own time. The only income appellants derived from the Property was the rental income from Tower Valet.

In February 2004, CCSF filed its first amended and operative complaint in eminent domain against appellants. In April 2005, appellants filed their second amended answer, claiming compensation for loss of business goodwill under Code of Civil Procedure section 1263.510.[1] In June 2005, the trial court granted CCSF's motion to strike this claim. Appellants filed a petition for writ of mandate seeking relief from the trial court's order and we granted relief, concluding there was an insufficient factual record to support the order. (*Coyne v. Superior Court* (Nov. 2, 2005, A111138) [nonpub. opn.].) However, we specifically declined to reach the question of whether appellants' claim for lost goodwill to their business of developing the Property was cognizable under section 1263.510.

The trial court bifurcated trial with respect to the proposed taking. The phase I court trial addressed whether CCSF had the right to take the Property and whether appellants had satisfied the statutory conditions for entitlement to business goodwill (§ 1263.510). The phase II jury trial determined the just compensation for the taking of the Property. Prior to the court trial, CCSF filed a motion in limine to exclude evidence in support of appellants' goodwill claim. The court deferred ruling on the motion until after the presentation of evidence at the court trial.

The court trial commenced in April 2006. Appellants' goodwill expert, Aaron Amster, testified that appellants' real estate development business lost between $2.1 and $2.9 million in goodwill as a result of the eminent domain action. CCSF's experts, Chris Carneghi and David Bohegian, both real estate appraisers, opined that there was no goodwill associated with the Property prior to the taking, and, therefore, appellants had not suffered a loss of goodwill.

---

[1] All undesignated section references are to the Code of Civil Procedure.

Following trial, the court ruled that appellants had failed to establish entitlement to lost goodwill under section 1263.510 and were precluded from introducing evidence thereof to the jury.[2] Citing section 1263.510, subdivision (a), the court determined that appellants "failed to meet their burden of proving that they are the owners 'of a business conducted on the property taken.'" The court also concluded that appellants "failed to establish that they suffered a loss of goodwill typical of an ongoing small business forced to move and give up the benefits of its former location. [Appellants] have not shown that they lost patronage or name recognition as another business might if it was forced to move. [Appellants] failed to establish the loss of any benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage. [Appellants] have not shown that they lost anything other than an amount remaining after the fair market value of the land, as well as construction and marketing costs, are deducted from the projected income from the sale of the units. Since the complex was never built or marketed and no units were sold, this remaining sum—labeled by [CCSF] as 'profit' and a portion of which is labeled by [Appellants] as 'goodwill'—is somewhat speculative." The court went on to state that appellants had met the other threshold requirements for goodwill compensation. (§ 1263.510, subd. (a)(1)–(4).) A jury trial to determine the value of the Property followed, and the jury found that just compensation for the Property was $2,767,500.

Appellants filed this timely appeal from the judgment.

## DISCUSSION

### I. *The Statutory Scheme*

■ "The state's power to take property by eminent domain is conditioned on its obligation to pay 'just compensation' to the owner. [Citations.] 'Just compensation' is defined as 'fair market value' [citation], which in turn is defined as 'the highest price on the date of valuation that would be agreed to by a seller . . . and a buyer . . . each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available' [citation]. The constitutional guarantee of 'just compensation' is obviously intended to protect the landowner, but it also protects the public by limiting its liability to losses that can fairly be attributed to the taking. ' "A landowner is not entitled to be placed in a better

---

[2] The court also rejected appellants' affirmative defenses to CCSF's right to take the Property. Appellants do not challenge this portion of the court's ruling, and we do not address it on appeal.

position financially than he was before the condemnation; neither is the state required to pay more than land is worth merely because of some theoretical, intangible concept." ' [Citation.]" (*Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1094 [125 Cal.Rptr.2d 12] (*Emeryville Redevelopment*).)

■ Historically, lost business goodwill was not recoverable under eminent domain law. (*Inglewood Redevelopment Agency v. Aklilu* (2007) 153 Cal.App.4th 1095, 1107 [64 Cal.Rptr.3d 519] (*Aklilu*).) However, in 1975 the Legislature enacted section 1263.510 "in response to widespread criticism of the injustice wrought by the Legislature's historic refusal to compensate condemnees whose ongoing businesses were diminished in value by a forced relocation. [Citations.] The purpose of the statute was unquestionably to provide monetary compensation for the kind of losses which typically occur when an ongoing small business is forced to move and give up the benefits of its former location." (*People ex rel. Dept. of Transportation v. Muller* (1984) 36 Cal.3d 263, 270 [203 Cal.Rptr. 772, 681 P.2d 1340] (*Muller*).) Thus, a business owner's right to compensation for loss of goodwill is a statutory right, not a constitutional right. (*Redevelopment Agency v. International House of Pancakes, Inc.* (1992) 9 Cal.App.4th 1343, 1348 [12 Cal.Rptr.2d 358].)

By statute, if the owner of a business being conducted on the property taken establishes certain preconditions, he or she is entitled to compensation for the loss of goodwill that results from the taking. "The owner of a business conducted on the property taken, or on the remainder if the property is part of a larger parcel, shall be compensated for loss of goodwill if the owner proves all of the following: [¶] (1)The loss is caused by the taking of the property or the injury to the remainder. [¶] (2) The loss cannot reasonably be prevented by a relocation of the business or by taking steps and adopting procedures that a reasonably prudent person would take and adopt in preserving the goodwill. [¶] (3) Compensation for the loss will not be included in payments under Section 7262 of the Government Code. [¶] (4) Compensation for the loss will not be duplicated in the compensation otherwise awarded to the owner." (§ 1263.510, subd. (a).) The statute defines goodwill as "the benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage." (§ 1263.510, subd. (b).)

■ Compensation for loss of goodwill in eminent domain proceedings "involves a two-step process. Whether the qualifying conditions for such compensation [citation] have been met is a matter for the trial court to resolve. Only if the court finds these conditions exist does the remaining issue of the value of the goodwill loss, if any, go to the jury. [Citations.]" (*City of Santa Clarita v. NTS Technical Systems* (2006) 137 Cal.App.4th 264, 269–270

[40 Cal.Rptr.3d 244], fn. omitted.) "Under section 1263.510, subdivision (a), the business owner has the initial burden of showing entitlement to compensation for lost goodwill." (*Aklilu, supra,* 153 Cal.App.4th at p. 1107.) Where, as here, the entitlement to business goodwill is disputed, "the determination of that dispute, including the resolution of any disputed factual issues, is for the trial court." (*Emeryville Redevelopment, supra,* 101 Cal.App.4th at p. 1119.)

Section 1263.510 "does not provide any guidance as to how the value of lost goodwill should be calculated. Consequently, the courts have recognized that 'there is no single method by which to measure goodwill' [citation] and that ' " '[e]ach case must be determined on its own facts and circumstances . . . .' " ' [Citation.] Nevertheless, the evidence presented to a jury regarding lost goodwill ' " 'must be such as legitimately establishes value' " ' [citation] and 'generally represents the present value of the anticipated profits of the business.' [Citations.] In other words, while there are no explicit statutory requirements regarding an expert's use of a particular methodology for valuing lost goodwill, the expert's methodology must provide a fair estimate of *actual* value and cannot be based on hypothetical or speculative uses of a condemned business. [Citations.]" (*Redevelopment Agency of San Diego v. Mesdaq* (2007) 154 Cal.App.4th 1111, 1129 [65 Cal.Rptr.3d 372] (*Mesdaq*).) In goodwill proceedings, as with other proceedings, "a trial court has a special obligation to oversee the admission of expert testimony and, where an objection has been made, 'shall' exclude 'testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion.' [Citation.] A challenge to the trial court's admission or rejection of expert testimony regarding the calculation of lost goodwill is reviewed for abuse of discretion. [Citation.]" (*Id.* at pp. 1129–1130.)

## II. *Appellants Did Not Have an Ongoing Business Located on the Property Taken*

Section 1263.510 provides for compensation for losses resulting from the forced relocation of an *ongoing* business conducted on condemned land. (§ 1263.510, subd. (a); *Muller, supra,* 36 Cal.3d at p. 270; 1 Matteoni & Veit, Condemnation Practice in Cal. (Cont.Ed.Bar 3d ed. 2008) Just Compensation, § 4.64, p. 186.) There is no evidence of an ongoing business located on the Property, aside from the parking lot.[3] Appellants' expert, Amster, calculated goodwill based on the profits to be derived from the sale of residential and commercial units in a condominium complex located on the Property. At the time the land was taken, however, the condominium complex did not exist. The CCSF Planning Commission had approved appellants' development

---

[3] Appellants have never sought recompense for goodwill generated by that enterprise.

application, but no building permit had been issued and no construction had begun. Moreover, none of the units had been presold or preleased. Thus, at the time CCSF initiated the eminent domain proceeding, there was no ongoing business devoted to retailing the condominium units to potential customers.

Appellants concede their business had no patrons, but argue under *Muller* loss of patronage is legally irrelevant to a determination of goodwill. That is an overstatement. In *Muller*, a veterinary business was forced to relocate when the property on which it was located was taken by the Department of Transportation (DOT). (*Muller, supra,* 36 Cal.3d at p. 265.) The owner selected a nearby site, with higher rent, in order to avoid a loss of patronage. The DOT argued there was no loss of goodwill because patronage had remained steady. The Supreme Court rejected the contention that section 1263.510 authorized compensation only for a loss of patronage itself, concluding that the higher rent, incurred largely to forestall such a loss, was compensable. (*Muller,* at p. 269.) That is, *Muller* held recovery for business goodwill did not require a net *loss* of patronage and expressly permitted recovery for expenses necessarily incurred to prevent such a loss. (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 537 [86 Cal.Rptr.2d 473].) In any event, at the time of the taking appellants lacked not only customers, but a product or service as well; they had no ongoing business conducted on the Property.

Appellants focus on their role as developers and argue they were actively engaged in the business of developing a multiunit residential and commercial complex, and that business lost its goodwill as a result of the taking of the Property. They contend they are entitled to recover for lost goodwill because the Legislature "has decided, as a matter of public policy, that a business owner whose business is damaged by the taking of property upon which *the business depends* for its operations should be compensated for any resulting loss of goodwill." (Italics added.) But appellants' mischaracterization of the Legislature's policy decision highlights the error in their claim for recovery.

■ A property development business may be entitled to compensation for loss of goodwill when it is located on property taken by eminent domain. For example, if a real estate developer has an office on parcel A, where it presells units to be built on parcels X and Y (or A for that matter), the condemnation of parcel A will deprive the developer of "a business conducted on the

property."[4] However, the condemnation of parcel X or Y will not have this result, even if the business *depends* upon those parcels, because the business is not located on them.

Appellants had no development *business* located on the Property. They had no office, no telephone or fax machine, no mail delivery, and no business records located at that site at the time of the taking. When they registered their business with the State of California, they listed a different site as their place of business. To be sure, O'Flynn testified he was occasionally present at the Property and made cell phone calls related to the development and met with surveyors, architects, and neighbors. But these few acts are insufficient to demonstrate appellants' development business was *located* on the Property, even if that business *depended* on that site.

Appellants also argue that "[b]y its nature, the business of developing a particular piece of property is conducted on the property itself." They cite no legal authority for that proposition and we are aware of none. The absence of such authority suggests the novelty of appellants' claim for lost goodwill. And appellants' position as owners of raw land taken by eminent domain is sufficiently common that the novelty of the argument demonstrates its weakness.

At bottom, accepting appellants' argument would mean that they would be able to recover the fair market value of their land and any entitlements (such as the CCSF Planning Commission approval), and to an additional recovery for the loss of a portion of their anticipated future profits, which they label "goodwill." This conflicts with a long line of California cases rejecting the "developer's approach" for valuing property taken by eminent domain. "The developer's approach (also known as the 'economic analysis' or 'residual land value' approach) as a method for measuring the fair market value of undeveloped land has been repeatedly held inadmissible by California courts. . . . Stated another way 'evidence of value in terms of the money which the land would bring for a specific purpose or as a result of a projected specific plan of development is not admissible as an element in determining such market value.' [Citations.] [¶] The rationale for this rule is that the expenses of completing the [project], improving the land, laying out streets, holding it and paying out taxes and interest until the [units] are sold are far too uncertain and conjectural to allow finished [unit] prices to be used as a basis for computing value. [Citation.] As one court put it '[s]uch evidence opens wide the door to unlimited vagaries and speculations concerning problematical prices which might under possible contingencies be

---

[4] Of course this hypothetical developer would be unable to recover for lost goodwill unless it was able to establish compliance with the other requirements of subdivisions (a) and (b) of section 1263.510.

paid . . . .' . . . [Citation.]" (*Contra Costa Water Dist. v. Bar-C Properties* (1992) 5 Cal.App.4th 652, 657–658 [7 Cal.Rptr.2d 91] (*Bar-C*).) *Bar-C*, like our case, involved entitled but undeveloped land.

Appellants' expert, Amster, testified that he derived the value of lost goodwill as follows. He determined the fair market value of the business as of July 1, 2005, to be $9,479,214 by multiplying the total square footage of the proposed residential units by a price of $950 per square foot and the total square footage of the proposed commercial units by a price of $620 per square foot, and deducting an expected 5 percent real estate commission. These per-square-foot sales prices were based on the professional opinion of a real estate appraiser retained by appellants, Walter Ricci, and rested on comparable condominium sales at or around the projected date of completion, March 2005. Using an "imputed annual discount rate of 20 [percent] at 322 days," he determined the fair market value of the business as of August 13, 2004, was $8,070,850, stating this percentage reflected the expected rate of return that real estate developers would typically demand for an investment similar to appellants' project. He next subtracted the value of the tangible investments made by appellants, the projected costs to construct the proposed building, and the fair market value of the land. Amster used a figure of $2,788,000 for estimated construction costs, based on construction cost budgets prepared by appellants for the project, construction cost information from one of Coyne's previous construction projects, and conversations with an insurance agent, a loan officer, and Ricci. He used a figure of $3,150,000 for the fair market value of the land, based on Ricci's professional opinion. Amster's calculations yielded a residual rounded value of $2,133,000, which he claimed represented the goodwill possessed by appellants' business but for condemnation. Amster also performed an alternate goodwill calculation using a figure of $2,385,000 for the fair market value of the land, based on the professional opinion of Bohegian, a real estate appraiser retained by CCSF.[5] Amster's alternate calculation resulted in a lost goodwill value of $2,898,000.

It is evident that each step in appellants' calculation involves a significant degree of speculation regarding the market conditions affecting the cost of construction and the revenue from sales of the commercial and residential units planned by appellants. This speculation is compounded by the inherent uncertainty in determining the start and completion dates for construction and the length of the "absorption period" during which appellants would sell the

---

[5] Bohegian testified that both his and Ricci's opinions of the fair market value of the Property included the existence of entitlements to build on the land. Bohegian explained that their opinions of fair market value were based on sales of comparable properties, some of which included entitlements.

units, close escrow, receive payment, and repay the bank. Amster's calculation of lost goodwill is based on anticipated profits from proposed condominium units that were not yet built, marketed, or sold. The trial court properly rejected it.

Appellants seem to concede their goodwill valuation method tracks the developer's approach, but argue the line of cases exemplified by *Bar-C* simply precludes use of this calculation for valuing undeveloped land, not for valuing goodwill. In the context of our case, this is illogical. The "developer's approach" has been disapproved as a method for valuing undeveloped land because it depends upon the developer's specific development plan. Appellants add to the value of the raw land an amount, which they wish us to treat as "goodwill," that also depends upon their specific development plan. The two approaches rely on precisely the same elements: Appellants started from the assumption of a completed condominium development, then deducted construction costs, "normal" profits, and raw land value to reach an estimate of "excess profits" or "goodwill"; the developer's approach starts from the assumption of a completed development, then deducts construction costs and expected profit to reach an estimate of raw land value. (*Bar-C, supra*, 5 Cal.App.4th at pp. 655–656.) Both approaches require estimates of "uncertain and conjectural" figures such as the expenses of completing the project, improving the land, and holding it and paying out taxes and interest. (*Id.* at p. 658.) These estimates do not become less uncertain or conjectural simply because they are used to calculate excess profits or lost goodwill, rather than fair market value of the undeveloped land. If we adopted the rule proposed by appellants, we would allow developers of raw land to achieve through the back door precisely what California case law has long denied them at the front, a recovery rooted in a specific development plan.

Appellants argue their method of calculating goodwill was specifically approved in *Muller. Muller* stated that "[c]ourts have long accepted that goodwill may be measured by the capitalized value of the net income or profits of a business or by some similar method of calculating the present value of anticipated profits. [Citations.]" (*Muller, supra*, 36 Cal.3d at p. 271, fn. omitted.) The property owner in *Muller*, however, owned a veterinary clinic located on the property that had been in existence for more than 20 years. (*Muller*, at pp. 265–266.) Historic revenue and expense figures drove his goodwill calculation. If appellants had had an ongoing business that entitled them to make a claim for lost goodwill, *Muller*'s method of calculating the *amount* of that claim would be appropriate here. But they did not.

*Mesdaq* confirms the wisdom of the trial court's ruling. In *Mesdaq*, the redevelopment agency initiated eminent domain proceedings to obtain possession of Mesdaq's property, a cigar and coffee shop. (*Mesdaq, supra*, 154

Cal.App.4th at pp. 1117–1118.) Mesdaq's expert testified Mesdaq lost over $3.3 million in business goodwill as a result of the taking. (*Id.* at p. 1127.) The expert explained he used the "discounted cash flow methodology," estimating future profits by projecting gross sales and deducting projected expenses, and then discounted those profits to their present value. (*Id.* at pp. 1127–1128.) In projecting future sales for the years 2005 and 2006, the expert broke down sales into projected nonrestaurant sales and restaurant sales. The nonrestaurant sales projections were tied to Mesdaq's historical sales; the restaurant sales projections were not. Instead, these projections were a product of the number of seats Mesdaq had available and the median sales per seat in a comparably sized California restaurant. (*Id.* at p. 1128.) The expert admitted those calculations were not grounded in historical data, but "were based on '[w]hat the business would have done with a better use . . . of its resources,' and were obtained by 'maximizing sales' at the [business]." (*Ibid.*)

The Court of Appeal concluded the trial court abused its discretion in admitting the expert's testimony. (*Mesdaq, supra,* 154 Cal.App.4th at p. 1130.) The court noted that under the statutory definition of goodwill (§ 1263.510, subd. (b)), "a legal methodology for valuing lost goodwill in [Mesdaq's] case would include any valid measurement of the future anticipated profits at the [business]." (*Mesdaq,* at p. 1130.) The expert's method was invalid because it focused on the anticipated profits of a hypothetical business rather than Mesdaq's actual business. (*Id.* at p. 1131.) "[T]he goodwill statute does not contemplate compensation for hypothetical or potential as opposed to *actual* goodwill lost . . . . The 2005 and 2006 restaurant sales used to determine the future income streams to be discounted were based not on expected growth in Mesdaq's historical earnings, but represented anticipated profits from an 'imaginative' better use of Mesdaq's existing facility. [Citation.]" (*Id.* at pp. 1131–1132.) The expert improperly "approached the valuation of Mesdaq's business 'as a laboratory exercise rather than as an empirical measure of what actually existed.' [Citations.]" (*Id.* at p. 1132.)

■ Appellants' lost goodwill claim is subject to the identical criticism, it was based on a hypothetical multiunit commercial and residential complex, rather than any actual business. In February 2004, when CCSF passed its Resolution of Necessity and initiated eminent domain proceedings, appellants had not yet begun construction. Appellants erroneously "approached the valuation of [their] business 'as a laboratory exercise rather than as an empirical measure of what actually existed.' " (*Mesdaq, supra,* 154 Cal.App.4th at p. 1132.) Appellants' calculation of lost goodwill is even more speculative than the one in *Mesdaq,* where the expert calculated anticipated profits based on a better use of the business owner's existing facility. (*Id.* at pp. 1131–1132.) The trial court properly rejected it.

## DISPOSITION

The judgment is affirmed. CCSF is entitled to its costs on appeal.

Jones, P. J., and Dondero, J.,* concurred.

On December 29, 2008, the opinion was modified to read as printed above.

---

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.