Filed 6/26/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PAUL WITTENBERG et al., | |
| Plaintiffs and Appellants, | G046891 |
| v. | (Super. Ct. No. 30-2011-00507078) |
| BEACHWALK HOMEOWNERS ASSOCIATION, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Thierry Patrick Colaw, Judge.  Reversed.

Schiffer & Buus, Eric M. Schiffer and William L. Buus for Plaintiffs and Appellants.

Adams Kessler, Mary E. Gram, Aide C. Ontiveros and Adrian J. Adams for Defendant and Respondent.

\*        \*        \*

Defendant Beachwalk Homeowners Association (association) held an election to amend its bylaws. Plaintiffs Paul Wittenburg and Raymond Dukellis filed suit to void the result of the election, claiming the association's board of directors (the board) failed to comply with Civil Code section 1363.03, subdivisions (a)(1) and (a)(2).[1] Subdivision (a)(1) governs the use of "association media," such as a newsletter or Web site, during a campaign. If an association permits any "candidate or member" to advocate a point of view using association media, the association must give members with opposing viewpoints equal access to the same media. Subdivision (a)(2) requires an association to permit free access to common areas for purposes reasonably related to an election. After a bench trial, the court entered judgment for the association, finding it violated neither subdivision.

Plaintiffs contend the court erred in three ways. First, they claim the court erroneously interpreted subdivision (a)(1) as containing an exception permitting the board of directors to advocate a point of view using association media without triggering the equal-access requirement. Second, plaintiffs claim the court erroneously found certain communications, from the board, were merely informational rather than advocacy under subdivision (a)(1). Third, plaintiffs claim there is no substantial evidence supporting the court's finding that the association did not violate subdivision (a)(2) during the campaign. We agree on all three counts and reverse the judgment.

---

[1] All statutory references are to the Civil Code. References to "subdivision (a)(1)" and "subdivision (a)(2)" are to section 1363.03.

FACTS

Plaintiffs are individual homeowners and members of the association.  The association is governed by a seven-member board of directors who must be members of the association to serve and are elected by a vote of the members of the association.

The present conflict stems from paragraph nine of the association's Covenants, Conditions and Restrictions (CC&R's), which states, "no alterations, additions, or improvements, in connection with the common areas of the PRD [Planned Residential Development] shall be made at a cost of more than one thousand dollars ($1,000.00) without the approval of at least two-thirds (2/3) of the voting owners . . . ."  In October of 2010 plaintiffs sued the association, claiming the association had removed one pool, and were threatening to remove two more, without obtaining the two-thirds vote required by paragraph nine of the CC&R's.  In November of 2010, the court granted a preliminary injunction preventing the removal of any more pools without obtaining the two-thirds vote required under paragraph nine.  We refer to that lawsuit as the "pool litigation."

Rather than obtain a two-thirds vote to remove the pools, the board instituted a series of elections to amend paragraph nine of the CC&R's to increase the dollar threshold for requiring a vote, and to reduce the number of votes required to approve expenditures.  In November of 2010 the board sent a ballot and cover letter to the homeowners announcing an election to be held in December 2010.  The cover letter, which was drafted by board members who supported the amendment, described paragraph nine of the CC&Rs as "over broad, ambiguous, and open to interpretation on many levels."  The board warned, "As long as this subsection of the CC&R's remains in force, there will be disputes about what constitutes an alteration or an improvement. Additionally, obtaining two-thirds voter approval of every project over $1000 will gridlock our operations and drive up our costs through constant ballots and legal

3

expenses." Accordingly, the board proposed the following revision to paragraph nine: "The Association shall maintain the common areas and Association-owned assets, except as otherwise provided in the CC&Rs. The spending for operational, maintenance, and repair expenses shall be limited by Section 1366 . . . . Moreover, the Board of Directors may not make capital improvements to the common areas in any one fiscal year in excess of two and one-half percent (2.5%) of the Association's budgeted gross expenses for that year without the approval of a majority of the membership."[2] The letter praised this alternative as more flexible and reasonable, while still "a workable method of fiscal restraint." The letter concluded by warning, "If we don't take action now to resolve the situation with the CC&Rs, the Association is destined to become further mired in conflict and expensive litigation." As one board member at trial commented, the letter "is making a strong case" in favor of the amendment and agreed it was "encouraging them to vote yes on Amendment 8."

Accompanying the letter was a one-page attachment containing a section entitled "Case for amending the CC&Rs," and another section entitled "Case against amending the CC&Rs." The document was written by board members who supported the amendment. The board did not ask any opposing members for written input for the "Case against," but did listen to their arguments at homeowner forums and attempted to incorporate those arguments. The board specifically decided not to include any opposition material.

The board's proposal generated significant interest in the community. Fliers circulated throughout the community on almost a weekly basis.

Shortly after the board sent out the election materials, a homeowner requested use of the "rental side" of the clubhouse to put on a "town hall meeting" to support other candidates for the board of directors who had a different view than the view

_____

[2] The parties refer to this as the "8th Amendment" because it would be the eighth amendment to the CC&R's. For clarity, we simply refer to it as the "amendment."

4

expressed by the current board regarding the amendment. The association's clubhouse is divided between one side available for free and another available for rental. The rentals are handled through the community manager and generally rental requests do not come before the board. The homeowner tendered a check to the community manager for $200 representing the cleaning deposit, believing he did not have to pay the usual $90 rental fee under subdivision (a)(2). Two days later, however, the community manager called the homeowner and stated the board had rejected the request to use the clubhouse for free. Accordingly, the homeowner paid the additional $90 fee. At trial one of the board members in support of the amendment testified the homeowner request never came before the board because it went through the community manager, but also acknowledged the board should have given the homeowner a refund.

In order to pass outright under the CC&R's, the amendment required a yes vote from 75 percent of the members of the association. The board's aim, however, was more modest: a yes vote from 50 percent of the members, which would allow the board to file a petition to have the CC&R's amended under section 1356, subdivision (c)(4). To achieve 50 percent, the board needed 227 yes votes. The December 2010 election fell short of that, garnering 188 yes votes, which amounted to 64 percent of the votes that were cast, but not 50 percent of the total number of association members.

The board scheduled another election for April of 2011. In February of 2011 the board sent ballots and voting materials to all of the members. Included with those materials was a two-page letter regarding the amendment that was nearly identical to the letter sent in connection with the prior election, as well as the same summary of the cases for and against the amendment. The proposed amendment underwent one change: for expenses that would require a vote under the amendment, instead of requiring a 50 percent vote as before, the revised amendment would require a 55 percent vote in favor of the expenditure.

5

The association had a newsletter that went to all members on a monthly basis. The board exclusively drafted all of the content of the newsletter. In the February 2011 issue of the newsletter, the board included a section entitled "Update on the Proposed 8th Amendment to the Beachwalk CCRs," which listed a number of arguments in support of the amendment. For example, it asked, "Why is this so important and why does the proposed amendment benefit the community?" It answered by claiming paragraph nine was ambiguous, the proposed alternative was more modern and adaptable, and the amendment would help resolve the pool litigation. It also asked, "What will happen if the 8th amendment does not receive 227 yes votes?" It then listed several consequences, including the lawsuit regarding the pools would "drag on, generating huge legal bills," any homeowner "with the will and financial resources to sue the" association would do so on the basis of paragraph nine, the association's insurance rates would go up, otherwise willing homeowners would stop volunteering their time to the association, and operating costs would increase. As a result, the board promised to continue holding elections until the measure passed: "Therefore, we will be asking homeowners to vote on this issue again on the March ballot. And if we cannot get 227 yes votes in March, there will be another ballot on the same issue shortly thereafter." The article concluded with an exhortation to the members to vote yes on the amendment: "Vote YES on the proposed 8th amendment to our CCRs so we can put our money to use on physically improving Beachwalk." One of the board members who was in favor of the amendment testified this article was encouraging the homeowners to vote yes. Nonboard members were not invited to provide opposing viewpoints in the newsletter.

Shortly thereafter, a homeowner opposed to the amendment asked to write a response to the board's newsletter article to be published in the March 2011 issue of the newsletter. The board refused the request because only board members were permitted to publish articles in the newsletter.

At around the same time another homeowner opposed to the amendment requested use of a common area called the "greenbelt" for purposes of a political rally. The request was denied. The community manager explained by e-mail he was unable to obtain unanimous consent from the board, which was required for an action without meeting (which was necessary because no board meeting was scheduled between when the application was filed and the requested date for the rally). The homeowner replied with an angry e-mail decrying a violation of his rights under section 1363.03. The manager's only response was to say he would pass the homeowner's concerns on to the board, and he invited the homeowner to resubmit his request at the next regularly scheduled board meeting where a simple majority could approve his request, which was eight days after the date of the proposed political rally. The board members were concerned the homeowner had requested the greenbelt for the entire day, had requested the use of clubhouse tables and chairs, and had not specified the number of people that would attend. But there was no evidence those concerns were expressed to the homeowner, nor was the homeowner told he could resubmit the request with additional details or modifications and be approved prior to the date he had requested.

The association also had a glass-enclosed community bulletin board, which was controlled by the board. The newsletter was posted on the bulletin board, but nonboard members were not permitted to post materials to the bulletin board.

The board also maintained an association Web site. In March of 2011, the board added an update to the pool litigation on the Web site. The update concluded with another exhortation to vote yes on the amendment: "Members are encouraged to vote yes for the 8th Amendment so that the litigation can be resolved expeditiously." That update was present on the Web site at least through September of 2011. The board would not have allowed nonboard members to post material on the association Web site, nor were members invited to.

Subsequently, in the April 2011 issue of the newsletter, the board included a similar insert describing the ongoing pool litigation and encouraging members to vote in favor of the amendment: "Members are encouraged to vote yes for the 8th Amendment so that the litigation can be resolved expeditiously."

The April 2011 election likewise failed to receive 227 yes votes, falling short at 219 yes votes.

Shortly thereafter the board scheduled another election regarding the amendment for August 2011. In July the board sent out ballot materials together with a similar cover letter encouraging members to vote yes on the amendment. This time the letter added, "This issue has already gone before the homeowners on two occasions (December 2010 and April 2011). In both cases, the majority of those members who cast ballots voted to amend the CC&Rs; however, neither ballot received the necessary 227 yes votes. Although the [association] is filing a petition with the courts anyway, it is entirely possible the petition will not succeed without the 227 yes votes. Therefore, we must continue to conduct ballots (at a cost of approximately $5000 per ballot) until we can obtain 227 yes votes, or the courts accept the argument that the Beachwalk community suffers from irredeemable voter apathy."

No opposing homeowners asked to publish articles in the newsletter after the August 2011 election was announced, though two board members in favor of the amendment testified they would have refused such requests. As one of the board members stated, "I believe the policy is one of evenhandedness, no articles for the pro side and no articles for the con side."

The deadline for returning the ballots was August 15, 2011. On that day, however, the board had not received the ballots of 75 percent of the membership, which was the minimum required to pass the amendment under the CC&R's, so the board extended voting one week. The amendment ultimately received 258 votes in favor, and 105 against.

Having crossed the 227 vote threshold, the association petitioned the court to amend the CC&R's. Afterwards, plaintiffs filed the underlying complaint to invalidate the results of the August 2011 election.

Plaintiffs alleged the association violated subdivision (a)(1) by permitting board members to advocate their point of view using association media (thereby triggering the equal-access clause), and then refusing to permit opposing members to utilize the same media to express their point of view. Plaintiffs also claimed they were denied free access to common areas as required by subdivision (a)(2).

After a three day bench trial, the court issued its judgment and statement of decision finding in favor of the association.

First, the court held the association had adopted election rules in 2007 in compliance with section 1363.03. This was based on uncontested evidence showing the association adopted rules in 2007 essentially mirroring the language of section 1363.03. Plaintiffs do not challenge that finding on appeal.

Second, the court held the equal-access requirement of subdivision (a)(1) inapplicable: "The plain language of the statute makes a clear distinction between 'candidates or members' advocating a point of view and the 'association.' The statute provides by implication that the association, a non-profit corporation which acts through its board [citations], can endorse a candidate or point of view, but mandates that if a *candidate* or *member* is given access to the association's media then *all candidates* and *members* advocating a point of view 'including those not endorsed by the board' must be given equal access. The weight of the evidence presented establishes that the board authorized and issued the newsletter information in the 'Breeze', the pre-election Website information, and the cover letter and other attachments to the ballot materials for the August 22, 2011 election. The court finds that Association, acting through its legally

9

constituted board, used its own media to provide information related to the election and this did not trigger the provisions of [subdivision ](a)(1)."[3]

Third, the court held there was no violation of subdivision (a)(2): "There was no persuasive evidence produced to prove that there was any violation of [subdivision ](a)(2) regarding free access to common areas. The weight of the evidence presented establishes that Association allowed access to common area meeting space in Clubhouse #1, in the greenbelt area, and in other open common area space during the campaign for the August 2011 election, at no cost, to all members advocating a point of view, including those not endorsed by the board, for purposes reasonably related to the August 22, 2011 election." Plaintiffs timely appealed.

DISCUSSION

The Davis-Stirling Common Interest Development Act (the Act) (§ 1350 et seq.) governs homeowner associations. The Act "consolidated the statutory law governing condominiums and other common interest developments . . . . [Citation.] Common interest developments are required to be managed by a homeowners association [citation], defined as 'a nonprofit corporation or unincorporated association created for the purpose of managing a common interest development' [citation], which homeowners are generally mandated to join [citation]." (*Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 81, fn. omitted; see also *That v. Alders Maintenance Assn.* (2012) 206 Cal.App.4th 1419, 1425-1426.)

---

[3] The court also stated, "There was no credible evidence that any member of the Association changed his/her vote because of any information contained in any of the Association's media or ballot materials." Both parties agree, however, that this is not a relevant consideration. Thus we do not address it.

Section 1363.03 governs certain election procedures. The two subdivisions relevant to this appeal are subdivisions (a)(1) and (a)(2). Those subdivisions provide, "(a) An association shall adopt rules . . . that do all of the following: [¶] (1) Ensure that if any candidate or member advocating a point of view is provided access to association media, newsletters, or Internet Web sites during a campaign, for purposes that are reasonably related to that election, equal access shall be provided to all candidates and members advocating a point of view, including those not endorsed by the board, for purposes that are reasonably related to the election. . . . [¶] (2) Ensure access to the common area meeting space, if any exists, during a campaign, at no cost, to all candidates, including those who are not incumbents, and to all members advocating a point of view, including those not endorsed by the board, for purposes reasonably related to the election."

Section 1363.09, subdivision (a) creates a right of action for a violation of subdivisions (a)(1) and (a)(2). If a court finds they were violated, it may void the election results or impose civil penalties.

*The Court Erred in its Interpretation of Subdivision* (*a*)(*1*)

Plaintiffs first contend the court erred in interpreting subdivision (a)(1). In particular, plaintiffs contend the court's board-member exception to the equal-access provision violates both the text and policy of subdivision (a)(1). We review the court's statutory interpretation de novo (*Corrales v. Corrales* (2011) 198 Cal.App.4th 221, 226), and we agree the court erred.

The court concluded the board is immune from the equal-access provision. The court reasoned that subdivision (a)(1) does not apply to an association's use of its own media to endorse a candidate or viewpoint. But the text of subdivision (a)(1) does not support the court's interpretation. The equal-access provision of subdivision (a)(1) is triggered any time a "member" advocates a point of view using association media. It is

11

undisputed the board members in this case were — indeed had to be — members of the association. Thus, to the extent board members advocated their point of view in association media, whether expressing a personal viewpoint, or the collective viewpoint shared by a majority of the board members, the text of the equal-access provision straightforwardly applies.

The statutory text further undermines the court's interpretation by stating equal access must be granted to members advocating a point of view "including those not endorsed by the board." (subd. (a)(1).) This provision demonstrates the Legislature's particular concern that viewpoints opposing the board be heard. The court's interpretation turns that concern on its head and ensures the board can utilize association media to the *exclusion* of viewpoints "not endorsed by the board." As plaintiffs state in their brief, "If the Court created [a board-member exception], it would allow those in power the advantage of using Association media to advocate a point of view to the exclusion of any opposing view. Such a construction would only further empower those individuals already in power, and would weaken those individuals not in power. Not only would such a construction be fundamentally unfair, but it would facilitate rather than cure the evils intended to be remedied by the statute." We agree and hold board members are treated as any other member for purposes of subdivision (a)(1).[4]

The association argues, "Common sense dictates that a part of effectively fulfilling the duties owed by the Association includes providing recommendations to members about managing the property, protecting the Association's financial well-being,

---

[4] Plaintiffs filed a motion for judicial notice of the Senate bill analysis of Senate Bill 61, which was the bill that introduced subdivisions (a)(1) and (a)(2). (Sen. Bill No. 61 (2005-2006 Reg. Sess.).) A motion for judicial notice of published legislative history, such as the Senate Analysis here, is unnecessary. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45-46, fn. 9.) "Citation to the material is sufficient. [Citation.] We therefore consider the request for judicial notice as a citation to those materials that are published." (*Id.* at p. 46, fn. 9.)

12

and explaining the basis of Board recommendations."  We have no doubt this is so, and nothing about our holding precludes a board from fulfilling that duty.  We hold only, that under subdivision (a)(1), while in the midst of an election, the board must either give equal access to opposing viewpoints, or forego the use of association media to advocate its viewpoint.

*The Board Engaged in Advocacy*

The court further concluded the board's various communications were merely informational, and not advocacy:  "The weight of the evidence presented establishes that the board authorized and issued the newsletter *information* in the 'Breeze', the pre-election Website *information*, and the cover letter and other attachments to the ballot materials for the August 22, 2011 election.  The court finds that [the] Association, acting through its legally constituted board, used its own media to provide *information* related to the election and this did not trigger the provisions of" subdivision (a)(1).  (Italics added.)  The court erred.

We are not aware of any cases, nor have the parties cited any, interpreting the term "advocating" as used in subdivision (a)(1).  "We begin with the language of the statute.  If the text is sufficiently clear to offer conclusive evidence of the statute's meaning, we need look no further.  [Citation.]  If it is susceptible of multiple interpretations, however, we will divine the statute's meaning by turning to a variety of extrinsic sources, including the legislative history [citation], the nature of the overall statutory scheme [citation], and consideration of the sorts of problems the Legislature was attempting to solve when it enacted the statute [citation]."  (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 770.)

Black's Law Dictionary defines "advocacy" as "[t]he act of pleading for or actively supporting a cause or proposal."  (Black's Law Dict. (7th ed. 1999) p. 55, col. 2.)

13

And the verb "advocate" is commonly defined to mean "to plead in favor of." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 18, col. 1.)

This plain English definition, which we adopt, is consistent with the overall nature and purposes of section 1363.03. Subdivision (a)(1) was part of a bill that sought to "provide substantial new voting protections" to members of homeowner associations designed to "guarantee that basic democratic principles are in place during elections," which had previously been "contaminated by manipulation, oppression and intimidation of members, as well as outright fraud." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 61 (2005-2006 Reg. Sess.) as amended Apr. 12, 2005.) It is thus remedial in nature. "A statute which 'is remedial in nature and in the public interest is to be liberally construed to the end of fostering its objectives . . . . 'The rule of law in the construction of remedial statutes requires great liberality, and wherever the meaning is doubtful, it must be so construed as to extend the remedy.'"" (*People ex rel. Dept. of Transportation v. Muller* (1984) 36 Cal.3d 263, 269.) The definition above is sufficiently broad to ensure one side of a debate cannot monopolize the use of association media.[5]

---

[5] The parties debate whether we should interpret "advocating" as synonymous with "campaigning" as that term is used in the line of cases holding a public entity may not use public funds for "campaigning." (See, e.g., *Stanson v. Mott* (1976) 17 Cal.3d 206; *Vargas v. City of Salinas* (2009) 46 Cal.4th 1.) The *Stanson* line of cases make a distinction between "campaigning" and "informational" activity. The analogous issue in homeowner association election, i.e. the use of association funds, is governed by section 1363.04, which prohibits the use of association funds "for campaign purposes in connection with any association board election [or] for campaign purposes in connection with any other association election except to the extent necessary to comply with duties of the association imposed by law." (*Id*., subd. (a).) But this case is not about the prohibited use of association funds. It is only about the equal access rules found in subdivisions (a)(1) and (a)(2) — rules triggered by "advocacy," not "campaigning." Thus there is no need to distinguish (or not) between "campaigning" and "informational" activity. It is enough for our purposes to interpret the word "advocacy" and determine under that definition whether the board engaged in "advocacy."

With the proper definition of advocacy in mind, we reject the court's conclusion that the board's communications were purely informational and thus not advocacy. Both the association Web site and newsletter contained the statement, "Members are encouraged to vote yes for the 8th Amendment so that the litigation can be resolved expeditiously." This plainly amounts to advocacy within the meaning of subdivision (a)(1). The cover letter that was sent with each of the election ballot materials, described in detail in the facts section above, likewise advocated for the amendment's passage. One board member at trial described those letters as "making a strong case" in favor of the amendment and "encouraging them to vote yes on Amendment 8." Our review of those materials confirms that description.

Having engaged in advocacy, under subdivision (a)(1) the association was bound to permit other members equal access to association media. The undisputed evidence shows the association failed its duty. On at least one occasion the board outright refused to publish an article in the newsletter opposing an advocacy article the board had published. And though the association nominally enacted rules parroting the language of section 1363.03, it was undisputed at trial that the board's policy was to not permit homeowners to publish advocacy pieces in the newsletter or the association website, nor to permit homeowners access to the association bulletin board. Accordingly, the association violated subdivision (a)(1).

For the guidance of the court, we note, contrary to the apparent assumption of the parties and the court during trial, a violation of subdivision (a)(1) does not automatically void the election results. Section 1363.09, subdivision (a), provides, "Upon a finding that the election procedures of this article . . . were not followed, a court *may* void any results of the election." (Italics added.) "Ordinarily, the word 'may' connotes a discretionary or permissive act; the word 'shall' connotes a mandatory or directory duty." (*Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 433.) The legislative history confirms that usage here. An earlier version of the Assembly bill that

15

ultimately added subdivison (a)(1) read, "Upon a finding that the election procedures of this section . . . were not followed, a court *shall* void the results of the election." (Assem. Bill No. 1098 (2005-2006 Reg. Sess.) as amended Apr. 11, 2005 § 1, italics added.) We conclude the change from "shall" to "may" was intended to grant the court discretion.

*The Association Violated Subdivision* (*a*)(*2*)

Subdivision (a)(2) requires the association to give members free access to common areas "during a campaign" for purposes reasonably related to the election. The court held "[t]here was no persuasive evidence produced to prove that there was any violation of [subdivision ](a)(2) regarding free access to common areas" and that the association "allowed access to common area[s] for the August 2011 election, at no cost, to all members advocating a point of view, including those not endorsed by the board, for purposes reasonably related to the August 22, 2011 election." Under the unique circumstances of this case, the court erred by too narrowly defining the "campaign" as related solely to the association activities immediately preceding the August 22, 2011 election.

Plaintiffs presented evidence of two instances in which the association allegedly violated this subdivision.

In the first alleged violation, a homeowner attempted to reserve the rental side of the clubhouse at no cost to hold a town hall meeting in connection with the December 2010 election, but the community manager told him the board had rejected the request to use the clubhouse for free. Accordingly, the homeowner paid a $90 fee. At trial one board member testified the homeowner request never came before the board because it went through the manager, but also acknowledged she eventually became aware of it and admitted the board should have given the homeowner a refund. The only disputed aspect of this evidence is whether the board explicitly rejected the homeowner's request or whether the community manager did so independently.

16

In our view, that dispute makes no difference. The community manager was hired by the association to handle clubhouse reservations on behalf of the association. Regardless of whether this request came before the board, the fact remains that the homeowner requested the free use of a common area for purposes reasonably related to the election, but was denied and told to pay a fee instead. Assuming this event is properly considered a part of the "campaign," the court's comment that there was no "persuasive" evidence is unavailing in this context because the evidence is, in relevant part, undisputed.

The second alleged violation occurred when, before the April 2011 election, a homeowner requested the use of a common area known as the "greenbelt" for purposes of a political rally. The request was denied in writing without explanation, other than to invite him to resubmit the request at the next regularly scheduled board meeting, which was eight days after the requested date of the political rally. The board members had concerns that the homeowner had requested the greenbelt for the entire day, rather than a specific time period, and had not specified the number of people that would attend. There was no substantial evidence, however, that such concerns had been expressed to the homeowner, nor was the homeowner told he could resubmit the request with additional details or modifications and be approved prior to the date he had requested. His request was simply denied. Again, assuming this event occurred as part of the "campaign," the association's legal obligation under subdivision (a)(2) was to "[e]nsure access to the common area meeting space . . . to all members advocating a point of view . . . for purposes reasonably related to the election." The board did not fulfill its obligation.

The association does not contest that these events occurred. Instead, it argues they are irrelevant because they occurred in connection with the December 2010 and April 2011 elections, not the August 2011 election, which is the election plaintiffs challenge. The premise underlying the association's argument is that a violation is only

17

relevant to a single election, after which the association is absolved of any wrongdoing for purposes of future elections.

Subdivision (a)(2) does not explicitly address whether a particular violation may apply to multiple elections in circumstances such as those present here. It simply states access must be granted to common areas "during a campaign . . . for purposes reasonably related to the election." The issue, therefore, is whether the "campaign" in this case encompassed all three elections or restarted after each election.

As a practical matter, most campaigns will correspond to a single election. In the unique circumstances of this case, however, we hold the campaign to pass the amendment did encompass the December 2010, April 2011, and August 2011 elections. This case is unique because the board threatened to, and did, hold multiple elections in short succession until the amendment passed. Shortly after the December 2010 election failed, the board sent a message to the homeowners in the newsletter articulating arguments in favor of the amendment and stating, "Therefore, we will be asking homeowners to vote on this issue again on the March ballot. And if we cannot get 227 yes votes in March, there will be another ballot on the same issue shortly thereafter." They did not receive the required votes in the next election, so, true to their word, the board held another election and issued a similar warning: "This issue has already gone before the homeowners on two occasions (December 2010 and April 2011). . . . Although the [association] is filing a petition with the courts anyway, it is entirely possible the petition will not succeed without the 227 yes votes. *Therefore, we must continue to conduct ballots* (*at a cost of approximately $5000 per ballot*) *until we can obtain 227 yes votes*, or the courts accept the argument that the Beachwalk community suffers from irredeemable voter apathy." (Italics added.) The board itself, therefore, tied the two prior elections to the August 2011 election and threatened to continue holding elections until the Amendment garnered sufficient votes. Under these circumstances, we hold the "campaign" encompassed all three elections.

18

As noted above, however, we do not hold the court *must* void the August 2011 results, only that the violations of subdivision (a)(2) described above are relevant and should be considered in deciding whether to void the results of the August 2011 election.

DISPOSITION

The judgment is reversed.  Plaintiffs shall recover their costs incurred on appeal.


IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.