Filed 11/3/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE ex rel. DEPARTMENT OF TRANSPORTATION,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PRESIDIO PERFORMING ARTS FOUNDATION,<br><br>    Defendant and Appellant. | A145278<br><br>(San Francisco County<br>Super. Ct. No. CGC13534856) |

Presidio Performing Arts Foundation (the Foundation) appeals from a judgment entered after the court, at a bench trial, ruled that the Foundation failed to establish its entitlement to compensation for lost goodwill after its location was taken by respondent by eminent domain. (Code Civ. Proc., § 1263.510.) The trial court found that, although the Foundation demonstrated it had goodwill before the taking and lost goodwill due to the taking, it did not prove a "quantitative" loss of goodwill by calculating its pre-taking goodwill value (by subtracting the value of its tangible assets from its total business value), and then subtracting from that amount its post-taking goodwill value. The Foundation, a nonprofit organization, contends the court erred by requiring it to demonstrate entitlement in this manner, and that its expert's quantification based on a change in cash flow was sufficient.

We will reverse the judgment. For purposes of the threshold determination of entitlement to compensation, a party must establish that the taking caused *some* amount

1

of loss of goodwill due to the taking (along with the other requisites of the statute), but need not quantify the loss in the manner prescribed by the trial court.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  The Foundation and Building 1158

The Foundation, a nonprofit organization founded in 1998, provides performing arts instruction, cultural education, and social justice programs in the Presidio of San Francisco.  It is "an acclaimed nonprofit dance theatre" serving San Francisco Bay Area youth with dance education programs that have earned national and international recognition.

In 2003, the Presidio Trust granted the Foundation a fixed-term lease at below-market rates for Presidio Building 1158 (Building 1158), in recognition of the Foundation's charitable purpose.  The lease called for an initial five-year term, renewable for an additional five-year term.  The Foundation extensively remodeled and improved Building 1158 to transform it into a performing arts center and dance studio, installing ballet barres, mirrors, dance flooring, sound systems, changing rooms, and restroom facilities at a cost of over $300,000.  Building 1158 offered other advantages for a dance studio catering in part to children, including a safe drop-off area, plenty of available parking, and exclusive use of the building (minimizing security concerns).

In 2008, the Foundation and the Presidio Trust agreed to a five-year extension of the lease through mid-2013.  Operational revenues increased from $300,000 in annual revenue in fiscal year 2007 to $464,000 in fiscal year 2010.  By 2009, enrollment had grown to approximately 400 students.

### B.  The Caltrans Project

In 2009, respondent California Department of Transportation (Caltrans) undertook a highway improvement project to construct a south access to the Golden Gate Bridge on portions of U.S. Route 101 and State Route 1 in San Francisco, known as the Doyle Drive Replacement Project (Project).  The construction of the Project required the use, occupancy and possession of certain real property controlled by the Presidio Trust.  Caltrans and the Presidio Trust entered into a Right of Entry Agreement, by which

specified property—including Building 1158—would be delivered to Caltrans free and clear of all tenant and occupant interests.

     C.  <u>The Foundation's Departure From Building 1158</u>

In the fall of 2009, Caltrans informed the Foundation it would seize and demolish Building 1158 so that Caltrans could reconfigure Doyle Drive. The Foundation began to search for another suitable location in the Presidio, but no comparable space was immediately found and it was unknown whether a new facility would be located by the time the Foundation had to leave Building 1158 for the planned June 2010 demolition.

The Foundation cancelled its 2010 summer program because it would have taken place too close to the demolition date. The lack of certainty and looming eviction also led the Foundation to cancel its 2010 Annual Benefit fundraiser. Students, donors, and business partners left the Foundation for other dance companies, in search of stability. Caltrans repeatedly changed the Foundation's deadline to leave the building.

In the fiscal year ending June 2011, the Foundation's earned revenue dropped by 50 percent. The number of students enrolled in dance classes also dropped by half, to around 200 students. And the Foundation lost staff when it could not afford to pay salaries.

The Foundation vacated Building 1158 in June 2011. That same month, Caltrans agreed to pay the Foundation approximately $107,000 as just compensation for the Foundation's lost tenant improvements at Building 1158. The amount did not include anything for business goodwill lost as a result of the Foundation's relocation.

In September 2011, the Foundation entered into a lease with the Presidio Trust for space in Presidio Building 386 (Building 386), located at Arguello Boulevard. However, Building 386 costs more than Building 1158 and offers less functional space. The lease for Building 386 called for an increase in the security deposit from $25,000 to $49,000, a rent increase from $4,900 to $6,400 per month, and an increase in service district fees from approximately $1,200 to $1,920 per month, without a studio that might add revenue. Building 386 lacks a safe drop-off zone, offers significantly less parking, and, unlike Building 1158, is located in an area of the Presidio where public transportation does not

3

operate in the evening.  The new location shares restrooms with a co-tenant consisting of adults (an investment firm) and is an historical building that limits how the Foundation can configure the space.  As a result, the space has fewer ballet barres and mirrors than Building 1158.

In late 2011 and early 2012, the Foundation applied to Caltrans for compensation for loss of goodwill due to its relocation.  Caltrans denied the claim.

D.  Declaratory Relief Action

In October 2013, Caltrans filed a lawsuit for declaratory relief, requesting a judicial declaration that the Foundation could not establish entitlement to a claim for loss of business goodwill.

In December 2013, the Foundation answered the complaint and filed a cross-complaint for money due and owing, seeking a judicial finding that the Foundation was entitled to recover its lost goodwill under Code of Civil Procedure section 1263.510 and an award of just compensation for the taking of its goodwill.

E.  Bench Trial

A bench trial began in January 2015 to determine whether the Foundation could establish entitlement to compensation for lost goodwill.  (See *People ex  rel. Dept. of Transportation v. Dry Canyon Enterprises, LLC* (2012) 211 Cal.App.4th 486, 492 (*Dry Canyon*) [court determines threshold issue of entitlement to compensation for loss of goodwill].)  In addition to percipient witnesses, both parties called expert witnesses to testify about the existence and/or quantification of goodwill.

1.  Foundation's Expert Regus

Justin Regus, an economic analyst regarding business valuation issues since 2000, was accepted by the court as an expert and testified on behalf of the Foundation.

Regus's first assignment was to determine whether the Foundation had goodwill before the alleged taking that had caused the Foundation's relocation from Building 1158.  For this assignment, he identified facts concerning the Foundation's location at Building 1158, its reputation, its workers (e.g., board members and volunteers willing to give their time) and its quality (awards), and concluded there was the "presence of

4

goodwill at the Foundation" before the impact of the Project.  More specifically, these facts were "indicators" of the existence of goodwill.

Regus's additional assignments were to determine whether goodwill was lost and to quantify that loss.  Regus noted that the indicators of goodwill had changed, along with the Foundation's operational results, after the Project.  To measure the change, he employed a cash flow analysis.  In Regus's view, the "discounted cash flow methodology"—which he described as a "standard" valuation technique—was the most appropriate method to use, since the Foundation was a nonprofit organization.  He explained that, while excess cash flows generated by a for-profit business constitute profit that can be paid out to the owners of the business, a nonprofit entity dedicates its excess cash flows to its nonprofit purposes.  As to the Foundation specifically, Regus noted that it tried each year to "break even" by spending available revenue on its educational mission.

Regus's cash flow analysis was essentially as follows.  First, he determined the Foundation's relevant cash flow for fiscal year ending June 2010 to be negative, by approximately $14,000.[1]  Next, he assumed that the Foundation would have experienced a negative growth rate of four percent in fiscal year ending June 2011, such that the *expected* cash flow for fiscal year ending June 2011 would be a negative $14,760.  Regus then compared this expected cash flow for fiscal year ending June 2011 (negative $14,760) with the actual cash flow for fiscal year ending June 2011 (negative $77,273), and found a shortfall of $62,513—in other words, the Foundation's cash flow was $62,513 worse than expected.

Regus attributed the $62,513 shortfall entirely to the loss of goodwill, because it was not attributable to any change in the Foundation's tangible assets.  In this regard,

---

[1]     In conducting his cash flow analysis, Regus considered revenue, contributed support, operation costs, EBITDA (earnings before interest, taxes, depreciation and amortization), interest expenses, depreciation, non-cash expenditures and non-cash income, capital expenditures, and the Foundation's efforts to cut costs to minimize the impact on the organization, including reduced pay for some staff.

Regus had reviewed the Foundation's financial statements and balance sheets, along with testimony about the Foundation's tangible assets; he had "investigated whether there were changes in the values of the tangible assets;" and he concluded that "really what this shortfall indicates is a shortfall due to the change in goodwill." Regus opined: "There was *nothing in the tangible world that would have indicated this kind of a shortfall*." (Italics added.) On redirect, Regus added: "As I evaluated the change in operating results, one of many factors I examined was whether there was a material change in the tangible assets that would have pointed to such a change in the operating results and there wasn't. [¶] There simply wasn't a change such as that in the tangible assets."

Next, Regus applied the "Gordon Growth Model" to determine the value of the lost goodwill. Specifically, he capitalized the $62,513 in lost cash flow (attributed solely to lost goodwill) for fiscal year 2011 by applying a discount rate of 12.14 percent and a long term growth rate of 3.5 percent. The result of this calculation was $723,535. Regus then applied a present value factor of $1.08 and obtained a final valuation of lost goodwill of $781,000 in current dollars.

In light of his calculation that the Foundation had lost goodwill of $781,218 as a result of the taking, Regus concluded that the Foundation must have *had* at least $781,218 in goodwill before the taking.

Regus asserted that he was calculating the change in goodwill, as opposed to valuing the Foundation at any point in time or calculating the change in the total value of the Foundation. More specifically, Regus did not value the Foundation's business as a whole, extract the value of working capital and tangible assets from the value of the business as a whole, or otherwise determine how much of the overall value of the business constituted goodwill. Although he did not start with "the whole pie" and subtract out the intangible piece of the pie, he did separate the intangibles from the tangibles.

Regus explained that, to measure the loss of goodwill, it was unnecessary to determine the Foundation's precise goodwill value before the taking and its precise goodwill value after the taking, because his cash flow analysis looked at the change in

6

cash flow over time, and the change was not attributable to tangible assets. If the relevant *change* is measurable, it makes no difference what the beginning and ending points were. And because his goodwill valuation did not include the Foundation's tangible assets, there was no need to subtract the value of those tangible assets to arrive at a valuation of lost goodwill.

### 2. Caltrans' Expert Goñi

Caltrans called its own expert witness, Ricardo Goñi, who was accepted by the court as an expert in the valuation of business goodwill. Goñi's assignment was to testify with respect to Regus's analysis; he did not opine on whether the Foundation had any pre-taking or post-taking goodwill, or had lost any goodwill as a result of the taking.

Goñi testified that the existence of goodwill is ascertained by first looking at a business's overall value as a "pie," and then extracting out the working capital and tangible assets, with the remaining portion constituting goodwill. According to Goñi, goodwill appraisers establish goodwill value in this manner in the "before condition," then establish a goodwill value in the "after condition," and deem any differential to be a loss of goodwill.

On these grounds, Goñi opined that Regus's analysis was flawed. Regus did not ascertain the value of the Foundation's business as a whole in the first place (using, for example, a discounted cash flow method), and then extract the value of its tangible assets. Although Regus identified projected increases in operational losses, in Goñi's view those additional losses have "no bearing at all on whether that business even had goodwill value to begin with. . . ."

Goñi showed the importance of determining whether there was goodwill in the before-condition (that is, before the taking) using an illustration. Applying Regus's analysis, Goñi took a hypothetical before-condition profit of $20,000, subtracted a hypothetical after-condition profit of $5,000, and found a difference of $15,000, which he then capitalized to reach a figure of $173,000. Applying Goñi's approach to the same hypothetical figures, Goñi used the before-condition $20,000 profit to determine a pre-condition total business value of $231,481, and then subtracted hypothetical tangible

assets of $250,000, which would lead to the conclusion that there was no goodwill (value over tangible assets) in the before-condition. In this hypothetical circumstance, the lack of any goodwill value in the before-condition would not have been detected by Regus's analysis.[2]

Goñi also noted that Regus's analysis indicated that he expected the Foundation "to always lose money to the tune of $14,760"—even before the relocation—and "it's now going to lose an additional $62,513 every year forever into perpetuity due to this project." He opined that there was no evidence that anyone would pay money for a company that does not expect a positive cash flow (let alone pay over $700,000 for it).

Goñi further testified that the method for valuating a nonprofit organization would be the same as the method used for for-profit organizations.

F.  Trial Court's Statement of Decision and Judgment

On March 20, 2015, the trial court issued a Statement of Decision, finding that the Foundation had not carried its burden of establishing entitlement to compensation for goodwill as required by section 1263.510.[3] Although it was "clear that Caltrans' taking caused the Foundation to suffer a loss of goodwill" due to the change in the Foundation's location, damage to the Foundation's reputation, and the disruption of its operations, the court concluded that the Foundation had nonetheless failed to meet its burden because it "failed to prove the *quantitative* . . . loss of goodwill." (Italics added.)

---

[2]     Goñi did not assume a situation where the before-condition profit of $20,000 declined to $15,000 for reasons unrelated to any change in tangible assets; he therefore did not directly opine that, *in the circumstances found by Regus*, the decline could not be due to a loss of goodwill or that this loss of goodwill would not indicate at least some pre-condition goodwill value. Goñi showed that Regus's theory would not work in the hypothetical Goñi proposed, but not in every instance or the particular facts of this case.

[3]     The court did find that Caltrans had taken the Foundation's property and was estopped from contending it had not done so. Caltrans asserts that it disputes the trial court's findings in this regard, but these matters are not at issue in this appeal. The question here is limited to whether the Foundation demonstrated entitlement to compensation for the goodwill that was purportedly lost due to the taking, assuming that the court was correct that there was a taking.

8

Echoing Goñi's testimony, the court explained that the "loss of goodwill is measured by comparing the amount of goodwill in the 'before condition,' which is the condition of a business before any project influence, and in the 'after condition,' which is the condition of the business after being impacted by the project." In the court's view, the decision in *City of San Diego v. Sobke* (1998) 65 Cal.App.4th 379 (*Sobke*) "stands for the commonsensical proposition that a business must have a quantifiable goodwill in the before condition, <u>before</u> the next step of calculating a loss can take place," and "[t]his principle was affirmed in the recent case of [*Dry Canyon, supra,* 211 Cal.App.4th 486]." (Underscoring in original.) Thus, the court concluded, "the goodwill before the condemnation must first be quantified, and that amount must be in excess of $0." Moreover, this "core principle in *Sobke* and *Dry Canyon* is not one dealing with the question of methodology," but "addresses the necessary <u>steps</u> and the simple logic of first establishing quantifiable goodwill <u>before</u> the next step of applying a methodology to calculate the loss." (Underscoring in original.)

The court then concluded that Regus did not, in fact, quantify goodwill in the before condition or the after condition. Regus "testified that he recognized [the Foundation's] qualitative attributes as defined in section 1263.510 in the before condition, but admitted that he did not quantify the amount of pre-existing goodwill other than by the discounted cash flow analysis." In this analysis, Regus "essentially compared the Foundation['s] cash flows during the fiscal year beginning June 30, 2010 and ending June 30, 2011, the capitalization of which was characterized as loss of goodwill," and then "opined that because of the operating loss, defendant must have possessed goodwill in excess of this amount in the before condition." In the court's view, Regus's analysis was "putting the proverbial cart before the horse, and is the exact fallacy discussed in *Sobke*." Further, the court asserted, "[n]ot only did the Foundation fail to quantify the amount of pre-existing goodwill, it has not deducted the value of the tangible assets in any of its analysis." The court concluded: "the Foundation has not met its burden in proving the quantitative loss of good will, as required by Code of Civil Procedure section 1263.510(a)(1)."

9

Judgment was entered in accordance with the statement of decision on June 2, 2015, and this appeal followed.

## II. DISCUSSION

A trial court's finding that a business owner has not established entitlement to compensation for a loss of goodwill is generally reviewed under the substantial evidence standard. (See *Dry Canyon, supra,* 211 Cal.App.4th at p. 493.) To the extent the court's conclusion is premised on the interpretation of the requirements of a statute, however, we review de novo. (*Id.* at p. 491.)

### A. Law

Business injury resulting from the exercise of eminent domain is not compensable under the just compensation clause of the state or federal constitutions. (*Community Redevelopment Agency v. Abrams* (1975) 15 Cal.3d 813, 816–817.) Instead, the right to compensation for loss of business goodwill is created by statute. (*City and County of San Francisco v. Coyne* (2008) 168 Cal.App.4th 1515, 1522 (*Coyne*).)

Code of Civil Procedure section 1263.510[4] was enacted "in response to widespread criticism of the injustice wrought by the Legislature's historic refusal to compensate condemnees whose ongoing businesses were diminished in value by a forced relocation. [Citations.] The purpose of the statute was unquestionably to provide monetary compensation for the kind of losses which typically occur when an ongoing small business is forced to move and give up the benefits of its former location." (*People ex rel. Dept. of Transportation v. Muller* (1984) 36 Cal.3d 263, 270 (*Muller*).)

Subdivision (a) of section 1263.510 reads: "The owner of a business conducted on the property taken, or on the remainder if the property is part of a larger parcel, shall be compensated for loss of goodwill if the owner proves all of the following: [¶] (1) The loss is caused by the taking of the property or the injury to the remainder. [¶] (2) The loss cannot reasonably be prevented by a relocation of the business or by taking steps and

---

[4] Except where otherwise indicated, all statutory references are to the Code of Civil Procedure.

adopting procedures that a reasonably prudent person would take and adopt in preserving the goodwill. [¶] (3) Compensation for the loss will not be included in payments under Section 7262 of the Government Code. [¶] (4) Compensation for the loss will not be duplicated in the compensation otherwise awarded to the owner." (Italics added.)

Compensation for the loss of goodwill under section 1263.510 involves a two-step process. First, the court determines *entitlement*: that is, whether the party seeking compensation has presented sufficient evidence of the conditions for compensation set forth in subdivision (a)—causation, unavoidability, and no double recovery—such that the party is entitled to *some* compensation. If the party meets this burden, the matter proceeds to a second step, in which a jury (unless waived) determines the *amount* of the loss. (*Coyne*, *supra*, 168 Cal.App.4th at pp. 1522–1523; *Dry Canyon, supra*, 211 Cal.App.4th at pp. 491–492.)

Since the conditions set forth in subdivision (a) all pertain to the "loss" of "goodwill," the initial obligation to establish entitlement to compensation requires a showing, "as a threshold matter, that the business had goodwill to lose." (*Dry Canyon, supra*, 211 Cal.App.4th at p. 491; see *Emeryville Redevelopment Agency v. Harcros Pigments, Inc*. (2002) 101 Cal.App.4th 1083, 1118, fn. 13 (*Emeryville*).) As we shall see, what it means to show "the business had goodwill to lose" will play a role in the resolution of this appeal.

From an accountancy perspective, the "goodwill" of a business generally refers to intangible aspects of a business—such as location, reputation, brand name, customer relationships, etc.—that gives the business value in excess of its tangible assets (and any identifiable intangible assets, not relevant here). So, for example, if a business has been purchased for a price higher than the value of its tangible assets, the purchaser will generally carry on its books the difference between the purchase price and the assets' value as goodwill. More apropos here, an *ongoing* business may be deemed to have goodwill value, based on its generation of profits (or certain other financial performance) beyond what its other assets would indicate. The value of this goodwill may be determined using a variety of methods: for example, determining the total value of the

business by capitalizing its cash flow, and then subtracting its tangible assets; or determining the amount by which the business's average profits exceed a fair rate of return on the fair market value of its tangible assets, and then capitalizing that amount. (See, e.g., *Muller, supra,* 36 Cal.3d at pp. 271–272 & fn. 7.)  But the essential idea is that there is some intangible "X-factor" that gives the business greater value than it would otherwise have.

For purposes of compensation under section 1263.510, "goodwill" is explicitly defined by the statute.  Subdivision (b) of section 1263.510 states:  "Within the meaning of this article, 'goodwill' consists of the *benefits that accrue to a business* as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage."  (Italics added; see *Muller*, *supra*, 36 Cal.3d at p. 268 [§ 1263.510 allows recovery for a loss of goodwill due to the loss of benefits caused by a forced relocation, including the loss of a lower rent at the pre-taking location].)

B.  The Foundation Established a Loss of Goodwill Benefits

As relevant to this appeal, the initial question is whether the Foundation offered sufficient evidence to establish that it suffered a loss of goodwill—or "benefit" as defined by the statute—as a result of the taking.  The Foundation attempted to make this showing with evidence of the factors listed in the statutory definition of goodwill, as well as with evidence that there was a quantifiable loss in the benefit derived from those factors.

1.  Evidence of Statutory Goodwill Factors

Through percipient witnesses and its expert Regus, the Foundation produced evidence that it had indicators of goodwill before the taking, such as its favorable location and its sterling reputation for quality and stability.  Not only did Regus testify that these were indicators of goodwill, they are specifically referenced in the statutory definition.  (§ 1263.510, subd. (b).)  The Foundation also demonstrated that *after* the taking these characteristics had been compromised, due to the disadvantages of the new location (such as higher rent and a lack of amenities) and an operational disruption that

12

tarnished its reputation. Furthermore, the Foundation experienced a reduction in patronage and revenue.

A reasonable inference from this evidence is that the Foundation suffered some loss of the benefit that had accrued to the Foundation as a result of the factors set forth in the statutory definition of goodwill. Indeed, the trial court concluded as much. The court found that "CalTrans' Project displaced the Foundation from its prior (superior) location. . . . The new location does not provide similar amenities and was not designed to serve as a performing arts space. [The new building] lacks the structural advantages and favorable lease terms that [the prior building] had. The change in the Foundation's location has negatively impacted patronage." The trial court stated that "[t]he damage to the Foundation's reputation as a result of the taking also constitutes *compensable goodwill*." (Italics added.) In addition, as a tenant in Building 1158 for years, "the Foundation developed standing in the community as an acclaimed nonprofit dance theatre. However, in the course of taking the property, CalTrans caused frequent and significant disruptions to the Foundation's operations. These interruptions led to a loss of students, employees, donors, and awards." The court concluded: "For the foregoing reasons, it is clear that CalTrans' taking *caused the Foundation to suffer a loss of goodwill*." (Italics added.)[5]

### 2. Quantification of Goodwill Benefit and Loss

Regus testified that the expected operational loss of the Foundation for fiscal year 2011, without the taking, was $14,760, but the actual operational loss was $77,273, for a difference of $62,513. Regus attributed this difference solely to a loss of goodwill,

---

[5] Caltrans insists that, when the trial court said that "Caltrans' taking caused a loss of goodwill," the court was really just saying that it thought the Foundation had shown it "possessed *qualities* that *may* create goodwill." (Italics added.) Caltrans' interpretation is untenable. The court explicitly found that the Foundation proved "qualitative" goodwill and a "loss of goodwill," not just qualities that might create goodwill. The problem, in the court's view, was that the Foundation had not established a "quantitative" loss: specifically, Regus had not quantified the loss of goodwill by valuating pre-taking goodwill and subtracting post-taking goodwill.

because, in his view, nothing related to the Foundation's tangible assets would account for it. He asserted that this loss, capitalized and adjusted to present value, yielded a valuation of the lost goodwill of $781,218.

### 3. Sufficiency of the Evidence

From the evidence that (1) due to the relocation precipitated by the taking, the Foundation ended up with a less desirable location, a diminished reputation, and operational disruptions (in other words, factors relevant to goodwill had been compromised); (2) patronage and revenues declined after the taking; and (3) the shortfall in expected cash flow after the taking could *not be attributed to tangible assets or any factor other than a decline in goodwill*, it could be reasonably inferred that the taking caused a loss of goodwill—specifically, a loss of "benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage." The Foundation presented substantial evidence to meet its burden under the first step of section 1263.510, subdivision (a).

The trial court ruled, however, that this evidence was not enough. Specifically, Regus did not follow the steps necessary to properly *quantify* the loss of goodwill, since he did not compare the value of the Foundation's pre-taking goodwill and the value of the Foundation's post-taking goodwill using a particular methodology. In addition, Caltrans argues, Regus not only failed to follow the right steps, the methodology he chose (capitalizing the shortfall of cash flow) could not accurately calculate the amount of lost goodwill. We consider these arguments next.[6]

---

[6] We also recognize that there are a number of assumptions in Regus's analysis. Among other things, his opinion turns on the assumption that the shortfall in cash flow was not, in fact, attributable to tangible assets or anything other than a loss of goodwill. Furthermore, he justified his cash flow methodology on the ground that the Foundation is a nonprofit organization, such that its profits are kept within the business (or reinvested in its mission) rather than paid out to an owner. Although both Regus and Goñi testified that a non-profit business can make profits and have revenue in excess of expenses, Regus emphasized that nonprofit organizations have a different goal than do for-profit businesses, and because their mission is not to maximize profit, their value cannot depend

14

C.  The Trial Court's Quantification Concerns

The trial court concluded that, in order to prove entitlement to compensation in the "entitlement" step of the proceedings under section 1263.510, the Foundation had to quantify the loss of goodwill value, the quantification of the lost goodwill value can only be accomplished by first determining pre-taking goodwill value and then subtracting post-taking goodwill value, and the only way to determine pre-taking goodwill value is to calculate the total business value and subtract the value of tangible assets.  We disagree.

1.  No Need to Quantify the Lost Goodwill in Entitlement Phase

In the entitlement stage of the proceeding, the party seeking compensation must show that it has suffered a "loss of goodwill."  (§ 1263.510, subd. (a); *Dry Canyon*, *supra*, 211 Cal.App.4th at p. 491.)  The precise *amount* of the lost goodwill, however, is an issue for the jury in the second phase of the proceeding.  (*Dry Canyon, supra*, 211 Cal.App.4th at pp. 491–492.)  Accordingly, in the entitlement phase, the party seeking compensation need only show that there was *some* loss of the benefit that the business was enjoying before the taking due to its location, reputation, and the like, without necessarily having to quantify its precise value.  (See *Redevelopment Agency of the City of Cathedral City v. Metropolitan Theatres Corp.* (1989) 215 Cal.App.3d 808, 811 & fns. 3–4 (*Redevelopment Agency*).)  As set forth above, the Foundation presented sufficient evidence to meet that requirement, Caltrans did not present substantial evidence to the contrary, and the court concluded that the Foundation had, in fact, lost goodwill due to the relocation that was precipitated by the taking.  Thus, to determine strictly whether the

on their profitability whether it is extracted from the enterprise or not.  On the other hand, Goñi opined that there are no differences between a for-profit and a nonprofit business regarding the goodwill they might possess.  Lastly, Regus explained how the Foundation had goodwill value before the taking, but Caltrans argues there could be no pre-taking goodwill value in light of his assumption that the Foundation had a negative cash flow in fiscal year 2010 and would have continued to have negative cash flow for ensuing years even if there had been no taking.  As discussed *post*, we do not decide these questions; nor do we preclude the trial court or the trier of fact from considering them on remand.

court erred in finding that the Foundation did not show entitlement to compensation, it is unnecessary to pass judgment on the Foundation's quantification of its loss of goodwill.

Nonetheless, we will consider the Foundation's effort to quantify its loss of goodwill for two slightly different reasons. First, if it is apparent at the entitlement phase that the party seeking compensation could not, in fact, proceed to prove the *value* of the lost goodwill—such that it could never prevail in the second phase—it would be within the court's authority to rule, even in the entitlement phase, that the party cannot prevail on its claim for compensation for lost goodwill and end the proceeding. After all, there would be no reason to impanel a jury on a claim that was doomed from the start. Second, looking at it from another perspective, if the trial court erred in concluding that the party had not established some loss of goodwill in the entitlement phase, the error would be harmless if the party could never prove the amount of that loss anyway. We therefore proceed to consider the trial court's reasons for rejecting Regus's attempt to quantify the lost goodwill.

2. Valuing Lost Goodwill by Comparing Pre-Taking and Post-Taking

The trial court ruled that the loss of goodwill must be quantified by comparing the amount of goodwill in the "before condition," which is the condition of a business before any Project influence, to the "after condition," which is the condition of the business after the impact of the Project. (Citing *Sobke, supra,* 65 Cal.App.4th 379, 396.) Regus did not purport to do this. Based on the record and arguments in this case, however, we are not convinced (and substantial evidence does not show) that the only way to quantify lost goodwill is by establishing pre-taking goodwill value and subtracting post-taking goodwill value.

Section 1263.510 does not dictate how the value of lost goodwill should be calculated. Certainly a comparison of the pre-taking and post-taking goodwill values would be one way to quantify the amount of goodwill that was lost due to the taking. But it is not evident from the appellate record that the amount of lost goodwill could not be calculated in some other manner. Here, assuming Regus's methodology is viable—a separate matter we discuss *post*—it is ostensibly logical for the loss of goodwill to be

16

quantified by (1) noting there was a shortfall in the Foundation's cash flow at the same time that the benefits of location and reputation were diminished; (2) measuring the shortfall in the Foundation's cash flow for fiscal year 2011; (3) attributing that shortfall to a loss of goodwill since there was nothing else to account for it; and then (4) capitalizing the loss of goodwill in fiscal year 2011 and arriving at a present value for the lost goodwill. In essence, if the *change* in goodwill can be quantified in this manner, it would be unnecessary to know the starting and ending points.[7]

A basic example illustrates the point. There is no dispute that one way to quantify the total value of a business is to capitalize its projected cash flow—that is, to apply a capitalization rate based on risk and other factors. (This is a simplified version of the discounted cash flow methodology to which both experts referred in their testimony.) Using this principle and the methodology of comparing pre-taking goodwill value and post-taking goodwill value, the analysis would be as follows. If, as of "Day One," the business's projected cash flow is 10 and the cap rate is 0.10, the total value of the business on Day One would be 100. Assuming tangible assets are 50, the goodwill value on Day One would be 50. If, as of "Day Two," the projected cash flow is 8 and the cap rate is .10, the total value of the business on Day Two would be 80 and, assuming tangible assets remain valued at 50, the goodwill value on Day Two would be 30. Subtracting the goodwill value on Day Two (30) from the goodwill value on Day One (50) would show a loss of goodwill value of 20.

But you reach the exact same result—without ever knowing the business's total value or goodwill value on either Day One or Day Two—by determining the *change in cash flow*. Taking the change in cash flow from Day One to Day Two (10 minus 8 = 2) and applying the cap rate (2 divided by 0.10 = 20) shows the change in total business

---

[7] Goñi's testimony that, essentially, appraisers do not valuate goodwill in this manner is evidence that Regus's methodology was different than what is usually employed. It does not, however, establish as a legal matter that a loss of goodwill cannot be quantified using another approach for purposes of section 1263.510. Nor does it provide substantial evidence that the methodology, as a factual matter, yields a valuation that is unreasonable in the circumstances of this particular case.

17

value; given that the change in cash flow is not attributable to any change in the tangible assets, the change in the business's total value cannot be attributable to any change in the tangible assets; and since the business's total value consists of only tangible assets and any goodwill, the change in the total value must be due to a change in the value of goodwill. Thus, the conclusion using either methodology is the same: the value of goodwill has decreased by 20. And if the value of the goodwill has decreased by 20, the value of the goodwill on Day One must have been at least 20 (or it could not have decreased by 20).

Another example is more akin to Regus's analysis. If the *expected* cash flow as of the end of a fiscal year is 10 and the cap rate is 0.10, the expected total value of the business would be 100. If the *actual* cash flow as of the end of the fiscal year is 8 and the cap rate is 0.10, the actual total value of the business would be 80. The difference in the expected and actual total values of the business is 20, and if there is no difference in the value of the business's tangible assets, the inference is that the difference is due to a decline in the value of the business's goodwill.[8]

The trial court and Caltrans, in insisting that lost goodwill must be established by subtracting post-taking goodwill value from pre-taking goodwill value—and in criticizing Regus's alternative methodology—relied extensively on *Sobke, supra*, 65 Cal.App.4th 379. Their reliance is misplaced.

---

[8] As we discuss *post*, the rub arises when the business's cash flow is *negative* rather than positive, as assumed here for the Foundation. If the cash flow on Day One is negative 10, applying the cap rate of 0.10 may suggest there is no goodwill value to lose on Day Two. The question, then, would be whether a different methodology could validly be employed to measure the benefit of the goodwill on Day One. Furthermore, if the Day One cash flow is negative and the Day Two cash flow is *more* negative, yet the decline is allegedly not due to tangible assets, at least two questions arise: (1) is the decline in cash flow truly not due to a decline in tangible assets or something other than goodwill (an issue of fact, not established by the evidence in the trial court); and (2) if the decline in cash flow is indeed due to an adverse effect on factors normally indicating goodwill (such as location), does section 1263.510 provide compensation for that adverse effect even if there is no goodwill value under certain methodologies (an issue of law). We address these issues in later sections.

In *Sobke*, the business's expert testified that the business had actually made *more* money after the taking, and that "application of the traditional methodology of comparing the value of a business's goodwill in its pre taking and post taking conditions would result in a determination that the *goodwill . . . increased* after the condemnation." (*Sobke, supra*, 65 Cal.App.4th at p. 396, italics added.) So instead of applying a traditional valuation methodology, the expert simply took the increase in rent and wages precipitated by the taking, capitalized those specific expenses in isolation *without considering the increase in revenues*, and called it the value of lost goodwill. (*Id*. at pp. 393–397.) The trial court excluded the expert's testimony, and the court of appeal ruled that the trial court had not abused its discretion. The appellate court in *Sobke* concluded: "Although [the expert] was not required to use . . . any other specific methodology in valuing goodwill, nothing in the case law or statutory authority suggests that *calculating isolated increased expenses without establishing the existence of actual pretaking goodwill and comparing its value with post-taking goodwill would under any circumstances constitute an appropriate methodology for evaluating loss of goodwill*." (*Id*. at pp. 398–399, italics added.)

*Sobke* is distinguishable from the matter at hand. In the first place, the point in *Sobke* is that the expert did not establish any value for lost goodwill since he merely capitalized certain expenses. *Sobke* does not hold that *every* type of business, no matter what factual showing it makes regarding the existence of goodwill, must quantify lost goodwill by establishing pre-taking goodwill and then comparing it to a value for post-taking goodwill.

Furthermore, while the trial court in this case found that Regus engaged in "the exact fallacy discussed in *Sobke*," he plainly did not. In *Sobke*, the expert merely added up the business's increased operating *expenses* and called the total "goodwill," without considering the post-taking revenue increases. (*Sobke, supra*, 65 Cal.App.4th at pp. 398–399; see *Dry Canyon, supra*, 211 Cal.App.4th at p. 494.) Regus was not merely "calculating isolated increased expenses:" he did not just look at one side of the equation

19

(expenses) and disregard the other (revenues), but examined lost *cash flow*. *Sobke* does not justify the court's order in this case.

### 3. Determining Pre-Taking Goodwill Value

Caltrans further argues that, even if there are different ways of quantifying the loss of goodwill, the Foundation had to at least prove that its pre-taking goodwill had a value. Indeed, at oral argument, Caltrans insisted that this was the essence of the court's order, and a failure by Regus to quantify pre-existing goodwill value was the fatal deficiency in his theory. Caltrans urges, "in *every instance* the goodwill must actually be shown to exist, so as to provide a *baseline from which to measure the claimed loss*." Moreover, Caltrans argues—and the trial court concluded—this calculation of pre-taking goodwill value must be accomplished in a specific way, by first calculating the business's total value and then extracting the value of its tangible assets (and "working capital"). [9]

We disagree. Even if the Foundation was required at the entitlement stage of this proceeding to quantify a pre-taking goodwill value, *Regus did so* (based on the amount of goodwill lost), and Caltrans' insistence that Regus was obliged to use Goñi's approach is contrary to the language and the purpose of the statute.

---

[9] Caltrans represents that the trial court, citing *Muller, supra*, 36 Cal.3d at p. 271, fn. 7, asserted that "whatever method is employed *must* measure goodwill by extracting the value of tangible assets or the normal return on those assets." Caltrans misquotes the trial court, and *Muller* did not make that statement either. Rather, *Muller* observed that the value of tangible assets (or the normal return on those assets) merely has to be excluded from the analysis. The court stated: "Goodwill must, of course, be measured by a method which excludes the value of tangible assets or the normal return on those assets. [Citation.] However, the courts have wisely maintained that there is no single acceptable method of valuing goodwill. [Citation.] Valuation methods will differ with the nature of the business or practice and with the purpose for which the evaluation is conducted. [Citation.] Nothing in this opinion is intended to restrict litigants in eminent domain actions from using other valuation methods than the one employed here." (*Muller, supra*, 36 Cal.3d at p. 271, fn. 7.) Regus testified that the tangible assets were, in fact, excluded from his analysis. Caltrans does not explain why, if Regus valued goodwill based on cash flow changes not attributable to tangible assets, there would be any need to subtract the value of tangible assets to reach a final value for lost goodwill.

20

*a. Proof of Goodwill, Not Goodwill Value*

As a preliminary matter, we note that the case law does not require at the entitlement phase a showing of the *value* of pre-taking goodwill, but merely some proof that goodwill *existed*. (*Dry Canyon, supra,* 211 Cal.App.4th at p. 493 [party must show "that the business had *goodwill* to lose"]; *Emeryville, supra,* 101 Cal.App.4th at p. 1118, fn. 13 ["a finding that the defendant had no *goodwill* to lose would preclude a finding of the four statutory preconditions to recovery" (italics added)].) The emphasis is on demonstrating goodwill—the existence of factors that carry a benefit—as opposed to an expert's quantification of its value. (See, e.g., *Inglewood Redevelopment Agency v. Aklilu* (2007) 153 Cal.App.4th 1095, 1110 (*Aklilu*) ["[a]fter [the expert] concluded the business *had goodwill based on its lease, location and prospects*, [the expert] set about determining the value of that goodwill" for the trial on the amount of value], italics added.)

*Dry Canyon*—the first case to hold that demonstrating "entitlement" to compensation required a showing that the "business had goodwill to lose"—illustrates the point. There, the state's expert indicated that the business was not profitable, its liabilities exceeded its assets, and it did not have goodwill before the taking. *Dry Canyon*'s expert nevertheless attempted to show there was goodwill using a cost to create approach and an approach he invented. However, Dry Canyon *never showed that it possessed any of the benefits of the factors such as location and reputation set forth in the statute*. (*Dry Canyon, supra*, 211 Cal.App.4th at p. 493.) Under those circumstances—a failure to show *any* facts indicating goodwill—the trial court was within its discretion to exclude *Dry Canyon*'s expert witness testimony and enter judgment. (*Id*. at pp. 493–495.) *Dry Canyon* therefore requires a showing of goodwill at the entitlement phase, but it does not hold that entitlement necessarily requires quantification of goodwill value, let

alone that such value could only be established by the methodology embraced by the trial court and Caltrans in this case.[10]

### b. No Single Methodology of Valuing Goodwill

Even if it were necessary to establish the value of pre-taking goodwill, it is not correct that the value can be established only by first determining the total business value and then deducting (or extracting) the value of tangible assets.

As our Supreme Court explained decades ago, "there is no single acceptable method of valuing goodwill." (*Muller, supra,* 36 Cal.3d at p. 271, fn. 7 ["goodwill may be measured by the capitalized value of the net income or profits of a business or by some similar method of calculating the present value of anticipated profits," but "nothing in this opinion is intended to restrict litigants in eminent domain actions from using other valuation methods than the one employed here"]; see *Aklilu, supra,* 153 Cal.App.4th at p. 1102 [accepting cost to create approach]; *Community Development Com. v. Asaro* (1989) 212 Cal.App.3d 1297, 1301–1305 [accepting a fair market value approach to determine capitalization rate]; *Sobke, supra,* 65 Cal.App.4th at pp. 391, 396 [courts have not prescribed " 'rigid and unvarying rules' for determining the value of goodwill," but "the evidence must be such as legitimately establishes value (italics omitted)"].)  "Valuation methods will differ with the nature of the business or practice and with the purpose for which the evaluation is conducted." (*Muller, supra*, 36 Cal.3d at p. 271 fn. 7.)

---

[10]     The trial court in this case concluded that section 1263.510 requires proof of loss by subtracting identifiable assets from total business value because *Dry Canyon* had stated that entitlement requires showing "the business had goodwill to lose" and elsewhere stated that " 'goodwill is the amount by which a business's overall value exceeds the value of its constituent assets.' " (Citing *Dry Canyon, supra*, 211 Cal.App.4th at pp. 491, 494.)  However, the court in *Dry Canyon* was simply explaining that, ordinarily, the methodology used to valuate goodwill will focus on profitability. (*Id.* at pp. 493–494.)  The court in *Dry Canyon* also indicated in the same discussion that loss of "goodwill" could be shown in other ways:  "But it is nevertheless possible for a business to have *goodwill but no profit*," and "the business [in *Aklilu*] *had goodwill* due to its superior location and lack of any competition." (*Id*. at p. 493, italics added.)

22

Indeed, the court in *Aklilu* upheld a methodology different than the profit-based approach Caltrans urges. In *Aklilu*, a business owner sought compensation for lost goodwill even though the business had not been profitable for four of the prior six years. (*Aklilu, supra*, 153 Cal.App.4th at p. 1103.) The expert testified that, before the taking, the business "had value in excess of the value attributable to its tangible assets," noting its "superior location." (*Id*. at pp. 1108–1109.) "After he concluded the business had goodwill based on its lease, location and prospects, [the expert] set about determining the value of that goodwill." (*Id*. at p. 1110.) The expert acknowledged that the business did not show any goodwill under the excess profit test. (*Id*. at p. 1101.) He "did not use the income approach to appraise [the business's] goodwill because it was not yet applicable to Aklilu's business and he did not use the market approach because it is rarely used for a small business due to a lack of comparables." (*Id*. at p. 1104.) Instead, the trial court allowed the expert to value the pre-taking goodwill using a "cost to create" approach, which equated the costs that would be incurred in creating the goodwill with the value of the goodwill itself, even though "no previous case had recognized [this approach] as an acceptable method of valuing goodwill." (*Id*. at p. 1101.) On appeal, the court affirmed, concluding that the " 'cost to create' approach is a permissible means by which to value goodwill under section 1263.510 where, as here, a nascent business has not yet experienced excess profits but clearly has goodwill within the meaning of the statute and experiences a total loss of goodwill due to condemnation of the property on which the business is operated." (*Id*. at p. 1102.)

Here, Regus did not use the cost to create approach, and the Foundation is a nonprofit organization rather than an unprofitable for-profit business. But *Aklilu* illustrates that a methodology other than the profit-based one dictated by the trial court in this case may apply under appropriate circumstances. As in *Aklilu*, Regus determined that the Foundation had some goodwill before the taking, based on its location and reputation, and then set about determining the value of that goodwill using a method not dependent on profits, in light of the nonprofit nature of the Foundation's enterprise. Although his proof that the Foundation had pre-taking goodwill value was inferential

23

(based on his conclusion that the shortfall in cash flow was due to a loss of goodwill, and the amount of lost goodwill showed that the Foundation had that much pre-taking goodwill value to lose), his valuation cannot be rejected simply because he did not use a profit-based methodology.

### c. Statutory Language and Purpose

Finally, the statutory language and purpose confirm that proof of goodwill and goodwill value do not require the profit-based methodology of finding the total business value and then subtracting tangible assets.

Section 1263.510 does not dictate that the only way to obtain compensation for the loss of goodwill is to prove pre-taking goodwill value based on a business value in excess of its tangible assets. Nor does the statute define goodwill as the value of a business not attributable to its tangible assets. Instead, it defines goodwill as consisting of "the *benefits that accrue to a business* as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage." (§ 1263.510, subd. (b), italics added.) What is compensated, therefore, is the loss of such a benefit, suffered due to a relocation compelled by a taking. Nowhere in the statutory language is there a precondition that this compensation is available only to a business that, before the taking, had a total business value in excess of its tangible assets, or profits in excess of a fair rate of return on its total assets.

Nor would limiting compensation to profitable businesses make sense. A business operating at a loss before a taking may not be able to demonstrate pre-taking goodwill value, but that does not mean that the benefits it enjoyed from its location and reputation have not been adversely affected by the taking. Nothing in the statute suggests compensation should be given to a business that was profitable but became less profitable, but deny compensation to a business that was unprofitable and became even more unprofitable. To do so would preclude recovery to those least likely to afford the loss of goodwill benefits due to a taking.

24

We must be mindful that section 1263.510 is a remedial statute to be construed liberally. (See *Muller, supra*, 36 Cal.3d at p. 270; *Aklilu, supra*, 153 Cal.App.4th at p. 1109; *People ex rel. Dept. of Transportation v. Leslie* (1997) 55 Cal.App.4th 918, 922 (*Leslie*).) "The goal of these eminent domain proceedings was 'to determine just compensation,' to wit, to put [the relocated party] in *'as good a position' as if its property had "not been taken.'* " (*Sobke, supra*, 65 Cal.App.4th at p. 395; see *Leslie, supra*, 55 Cal.App.4th at p. 923.) At bottom, the idea is "just compensation"—as in fair compensation—not "compensation just for the already profitable."

In sum, Regus's quantification of lost goodwill was not invalid merely because he did not follow the steps or methodology idealized by the trial court. The next question is whether the methodology that Regus *did* use was flawed.

D. The Validity of Regus's Capitalization of Cash Flow Shortfall

Caltrans contends Regus merely testified as to increased operational losses allegedly attributable to the relocation, which he capitalized and discounted to present value as lost goodwill. Caltrans urges that the shortfall in cash flow in fiscal year 2011 is not necessarily the same as a decline in goodwill, so capitalizing the shortfall in cash flow did not accurately quantify the lost goodwill.

We reiterate that Regus's testimony (as a whole, taken together with the rest of the Foundation's evidence) was sufficient to show some loss of goodwill value, whether or not he correctly quantified the exact value of that loss. Even if the shortfall in cash flow did not *equal* the amount of goodwill lost due to the taking, it was purportedly *caused* by a loss of goodwill (since there was allegedly nothing else to account for it), and so there must have been *some* loss of goodwill value. Indeed, we are not pointed to any evidence in the record that the difference between the Foundation's expected and actual cash flows for fiscal year 2011 was accounted for by tangible assets or something other than a change in goodwill. Given the evidence of *some* loss of goodwill, the exact amount of that loss may be determined after remand in the second phase of the statutory scheme.

As mentioned *ante*, if it were apparent that there was no way the Foundation could quantify the amount of lost goodwill in the second phase of the proceeding, the trial court

might be within its discretion to dismiss the Foundation's goodwill claim on that ground. However, *based on the appellate record in this case*, we cannot conclude that the Foundation will be unable to quantify the amount of lost goodwill.[11]

First, although Caltrans argues that capitalizing the shortfall in cash flow cannot accurately quantify lost goodwill, the trial court did not specifically base its ruling on the ground that the capitalization of the shortfall would result in an incorrect value given the particular facts of this case (including, for example, the Foundation's assumed negative cash flow).

Second, it is not clear that Regus's capitalization of the decline in cash flow was in fact improper. Although Goñi urged that Regus's opinion was flawed, he never opined that the Foundation did *not* have goodwill value before the taking or that it did *not* lose goodwill value as a result of the taking. There was no direct evidence that the shortfall in cash flow was due to tangible assets or something other than goodwill—critical assumptions to Regus's analysis—and the record does not show that, as a matter of law, Regus's methodology was incorrect.[12] Since quantifying the loss of goodwill is a matter

---

[11]    Because the entitlement phase under section 1263.510 did not require proof of the *value* of the lost goodwill, the trial court's order can be upheld only if no reasonable trier of fact could conclude from the evidence in the valuation phase that the Foundation lost goodwill of a quantified amount. For reasons stated herein, we find there *is* evidence from which a trier of fact *could* infer that the Foundation lost goodwill of a quantified amount. We also note that, while the Foundation had the burden of producing evidence at the entitlement stage, neither party has the burden of persuasion with respect to the *amount* of compensation under the statutory scheme, and Caltrans did not provide any expert witness evidence of its own in this regard. (*Redevelopment Agency, supra,* 215 Cal.App.3d at pp. 811–812; see § 1260.210.) In addition, even if the entitlement phase *did* require the Foundation to prove the specific value of lost goodwill (or at least some specific value of pre-taking goodwill), the court's ruling that the Foundation failed to meet its burden could not be upheld, both because the court committed legal error by misconstruing the statute and because substantial evidence did not support the conclusion that Regus's calculation would not work under the specific facts of this case. As emphasized in the text, we must reach our decision in this case based on its procedural posture, the arguments of the parties, and the evidence in the record.

[12]    As mentioned, Goñi testified (and gave an illustration) that Regus's methodology would not work if tangible assets exceeded the business's value based on capitalized cash

26

concerning the amount of goodwill lost, it is for the jury to decide between the competing views of the experts. (See *Leslie, supra*, 55 Cal.App.4th at pp. 922–923.)

Third, even if Regus's methodology as set forth in the evidence during the entitlement hearing was insufficient to yield a valid quantification of lost goodwill value, it is not clear from the record that he would be precluded from explaining, in the ensuing valuation phase, a viable basis for quantifying lost goodwill based on the shortfall of cash flow in fiscal year 2011.

In conclusion, the trial court was correct in finding that the Foundation had established that it lost goodwill due to the taking; but in light of both the state of the evidence and the nature of the statute, the trial court was incorrect in ruling that the Foundation had nonetheless failed to establish entitlement to compensation for that lost goodwill due to the approach and methodology Regus employed.

### III. DISPOSITION

The judgment is reversed.

---

flow; but he did not show that this circumstance—tangible assets exceeding the business's value—could exist if, as Regus asserted, the business's cash flow and total business value had declined and there had been no change in tangible assets. The answer to this question is not in the record, and we are confined to the record on appeal. Nor did Caltrans establish that, contrary to Regus's opinion, the change in the cash flow *was* due to a change in the tangible assets or something other than a change in goodwill; arguing that it *could* have been due to how the tangible assets were used is inadequate.

_____

NEEDHAM, J.

We concur.

_____

JONES, P.J.

_____

SIMONS, J.

(A145278)

Superior Court of San Francisco County, No. CGC13534856, Lynn O'Malley Taylor, Judge

Davis Wright Tremaine, Martin L. Fineman, Deborah A. Adler, James G. Parker, Andrew D. Patterson, Zeb Zankel for Defendant and Appellant.

California Department of Transportation-Legal Division, Ronald W. Beals, David E. Gossage, Lucille Y. Baca, Samuel C. Law, Derek S. Van Hoften, Jeanne Scherer for Plaintiff and Respondent.